# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

NAZLI MCDONNELL,
ERIC VERLO,

Plaintiffs,

vs.

CITY AND COUNTY OF DENVER,
DENVER POLICE COMMANDER ANTONIO LOPEZ, in his individual and official capacity,
DENVER POLICE SERGEANT VIRGINIA QUINONES, in her individual and official
capacity,

Defendants.

_____

## COMPLAINT
_____

Plaintiffs, by and through their attorneys David A. Lane and Andy McNulty of KILLMER,

LANE & NEWMAN, LLP, allege as follows:

## INTRODUCTION

1.  Plaintiffs Eric Verlo and Nazli McDonnell challenge a regulation of alarming breadth that

bans all First Amendment expression at Denver International Airport without a permit.

2.  Plaintiffs are concerned citizens who believe that President Donald Trump has

overstepped his executive authority by signing the January 27, 2017, Executive Order

(hereinafter "Muslim Ban"), which permanently bans Syrian refugees from emigrating to the

United States, temporarily bans nationals of seven countries (including permanent legal residents

and visa-holders), and suspends all applications to the United States refugee program (even as to

vetted entrants currently in transit).

1

3.   Plaintiffs wish to express their disgust with President Trump's (likely unconstitutional) Muslim Ban. They wish to do so in the same place that hundreds of thousands of Americans across the country have done: standing directly outside of the secure Customs and Border Protection (hereinafter "CBP") screening area within an airport where immigrants to America enter into the main terminal after clearing customs. Plaintiffs, unlike many citizens across this great nation who have exercised their opposition to the Muslim Ban in airports by chanting, singing, dancing, and praying, simply wish to stand in silent protest, holding signs that express their solidarity with immigrants and the Muslim community.

4.   Plaintiffs are banned from doing so by DENVER INTERNATIONAL AIRPORT REGULATION 50 (hereinafter "Regulation 50").

5.   Regulation 50 states: "No person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee." DENVER INTERNATIONAL AIRPORT REGULATION 50.03. In order to obtain a permit, an individual must "complete a permit application and submit it during regular business hours, at least seven (7) days prior to the commencement of the activity for which the permit is sought[.]" DENVER INTERNATIONAL AIRPORT REGULATION 50.04-1.

6.   Plaintiffs ask that this Court enjoin the enforcement of Regulation 50 and prohibit Defendants from arresting them for their First Amendment-protected activity of standing in peaceful protest within Jeppesen Terminal. Regulation 50 is overbroad in violation of the First Amendment and vague in violation of the Fourteenth Amendment's Due Process Clause.

7.    This is a civil rights action for declaratory and injunctive relief as well as fees and costs

arising under 42 U.S.C.  §§ 1983, 1988 and 28 U.S.C. Section 2201 *et seq*. due to Defendants'

current and imminent violations of Plaintiffs' rights guaranteed by the First and Fourteenth

Amendments to the Constitution of the United States.

## PARTIES

8.    Plaintiff Eric Verlo is a citizen of the United States of America. Mr. Verlo wishes to

show his resistance to President Trump's Muslim Ban, so that others will be inspired to join in

the resistance.

9.    Plaintiff Nazli McDonnell is a citizen of the United States of America.  Ms. McDonnell

wishes to show her resistance to President Trump's Muslim Ban, so that others will be inspired

to join in the resistance.

10. Defendant City and County of Denver is a municipal corporation and political

subdivision of the State of Colorado. Thus, it is an entity subject to the provisions of § 1983.

11. Defendant Antonio Lopez is a Commander with the Denver Police Department.

Commander Lopez is responsible for security at Denver International Airport's Jeppesen

Terminal.

12. Defendant Virginia Quinones is a Sergeant with the Denver Police Department.  Sergeant

Quinones is responsible for security at Denver International Airport's Jeppesen Terminal.

## JURISDICTION AND VENUE

13. Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983; the First Amendment to the

United States Constitution, incorporated as against States and their municipal divisions through

the Fourteenth Amendment to the United States Constitution; and the Due Process Clause of the

Fourteenth Amendment.

14. This Court has jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims that "arise[]

under the Constitution of the United States."

## FACTS

15. On January 27, 2017, President Donald Trump signed an Executive Order, which

permanently banned Syrian refugees from emigrating to the United States, temporarily banned

nationals of seven countries (including permanent legal residents and visa-holders), and

suspended all applications to the United States refugee program (even as to vetted entrants

currently in transit). President Trump's Executive Order has been subsequently referred to as a

"Muslim Ban," because it both mirrors President Trump's racist, anti-Islam statements made on

December 7, 2015, that he was planning to ban all Muslims from entering the United States until

our representatives can "figure out what's going on" and the ban targets countries whose

population is predominantly Muslim and seemingly bears little rational relation to each country's

security threat to the United States.

16. Immediately upon the enactment of President Trump's Muslim Ban there was an

outpouring of outrage from a large proportion of the American population and across the

spectrum of political affiliation. This outrage led to resistance in the form of protests.

17. On January 28, 2017, and January 29, 2017, protests erupted in nearly every major city in

the United States. The protests organically formed in our nation's airports. Protesters chose to

express their disgust with President Trump's Muslim Ban in airports (and specifically outside of

the secure CBP screening area) because individuals affected by the ban who were in transit to the

United States were being held and questioned by CBP agents there. Many of these travelers,

including lawful United States residents, were forced to sign documents revoking their lawful

status within the United States and deported. Still others were simply deported with no

4

explanation. Others still were held for hours as teams of lawyers rushed to prepare habeas petitions for their release.

18. News reports about the protests make clear that they have been peaceful and non-disruptive despite the gathering of, in some cases, thousands of people.

19. Airport staff have told protesters, and would-be protesters, at numerous airports across the nation, including Kansas City International Airport, that there are no restrictions on their speech and that all protesters who wish to participate in actions against the Muslim Ban are allowed. Protests have continued in other cities to this day.

20. On January 28, 2017, there was one such protest at Denver International Airport, within the Jeppesen Terminal. At approximately 5:00 p.m. hundreds gathered in the Jeppesen Terminal's atrium, near arrivals, to protest and many others gathered to bear witness.

21. Prior to the protest, leaders had applied for a permit. It was denied. The reason for its denial was that the permit was not requested with seven days advance notice of the protest occurring. Regulation 50 requires seven days advance notice.

22. The January 28, 2017, protest began with speeches, chants, songs, and prayers. It was a peaceful gathering of solidarity for immigrants and Muslims. Every person at the January 28, 2017, protest was contained in an area of the Jeppesen Terminal atrium that is designed as a gathering space for people to sit, relax, and converse. No one was standing in the walkways or passageways of the terminal.

23. Soon after the January 28, 2017, protest began, members of the Denver Police Department arrived on-scene. Commander Antonio Lopez engaged the leader of the protest, Amal Kassir, along with State Representative Joe Salazar and representatives from the ACLU of Colorado, and informed them that the protest was unlawful. Commander Lopez told Ms. Kassir

that anything that "could be construed as Free Speech" was prohibited at the Denver International Airport, including within the Jeppesen Terminal, without a permit. *See* **Exhibit 1**, *January 28, 2017 Video*.

24. Commander Lopez also stated that all "First Amendment expression" was prohibited at the Denver International Airport, including within the Jeppesen Terminal, without a permit on Regulation 50. Commander Lopez handed Regulation 50 to multiple protesters, including Ms. Kassir. *See* **Exhibit 2**, *January 28, 2017 Video 2*.

25. Regulation 50 states (in pertinent part): "No person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee." DENVER INTERNATIONAL AIRPORT REGULATION 50.03. In order to obtain a permit, an individual must "complete a permit application and submit it during regular business hours, at least seven (7) days prior to the commencement of the activity for which the permit is sought[.]" DENVER INTERNATIONAL AIRPORT REGULATION 50.04-1.

26. Commander Lopez, along with members of Denver International Security, told Ms. Kassir that every portion of Denver International Airport property, which has an approximately fifty square mile footprint, is off-limits for First Amendment expression. They suggested that Ms. Kassir move her protest to Tower Road, which is approximately six miles from the Jeppesen Terminal and, like most of the land surrounding Denver International Airport, adjacent to open prairie land with no inhabitants.

27. Commander Lopez threatened Ms. Kassir and numerous other demonstrators with arrest if they didn't immediately cease any "First Amendment expression." According to Commander

Lopez's directives, the individuals gathered in the Jeppesen Terminal could not stand holding signs, sing, speak to others about matters of public concern, hold the United States Constitution above their shoulders, or stand silently with their arms interlocked.

28. Ultimately, to avoid arrest, Ms. Kassir and the demonstrators moved outside of the Jeppesen Terminal to the large area on its south side, adjacent to the escalators leading to the commuter rail and under the Westin Hotel. The protest continued peacefully for a little while longer, then disbursed without issue.

29. The next day, January 29, 2017, Plaintiffs Eric Verlo and Nazli McDonnell traveled to Denver International Airport's Jeppesen Terminal to express their opposition to President Trump's Muslim Ban.

30. Mr. Verlo and Ms. McDonnell brought with them signs expressing support for immigrants and expressing concern that history was repeating itself with disastrous potential consequences.



31. Mr. Verlo and Ms. McDonnell positioned themselves adjacent to the secure CBP screening area within the Jeppesen Terminal at approximately 1:15 p.m.

32. Adjacent the secure CBP screening area at the Jeppesen Terminal is the only place where Mr. Verlo and Ms. McDonnell can reach their intended audience. Mr. Verlo and Ms. McDonnell wish to communicate with those who could be swayed by their message and, particularly, with immigrants. International travelers are often immigrants and/or lawful United States residents, including green card and other visa holders, other than citizens. Mr. Verlo and Ms. McDonnell wish to express their solidarity with immigrants directly to these individuals. Further, United States citizens who arrive from international locations are also individuals with whom Mr. Verlo and Ms. McDonnell wish to communicate. International travelers have experienced other cultures and are likely to be sympathetic to Mr. Verlo and Ms. McDonell's message.

33. The secure CBP screening area is also the location where the Muslim Ban has been enforced by DHS, both at Denver International Airport and across the nation. Neither Plaintiff attempted to enter any restricted areas of Denver International Airport.

34. While silently displaying their signs, Mr. Verlo and Ms. McDonnell were in the open plaza near the secure CBP screening area within the Jeppesen Terminal and positioned significantly behind the railing, which demarcates where those waiting for loved ones are permitted to stand. Mr. Verlo and Ms. McDonnell did not impede the right of way of any passengers hustling to catch flights at the last moment. They simply stood with placards showing their distaste for the Executive Order and the man who executed it.



35. Mr. Verlo and Mr. McDonnell also observed another man in the terminal, named Gene

Wells, who was expressing views similar to theirs.

36. Mr. Wells was wearing a sign taped to the back of his shirt.



37. Mr. Wells left the Jeppesen Terminal, but subsequently returned to protest. When he did,

he was stopped by Denver Police Department officers who told him that he could not walk

around the terminal with the slogan he had affixed to his back. Mr. Wells eventually rejoined Mr. Verlo and Mr. McDonnell at the international arrivals doors, but not without trepidation. He feared he might be arrested.

38. While Mr. Verlo and Ms. McDonnell were displaying their signs, Defendant Sergeant Virginia Quinones approached Mr. Verlo and Ms. McDonnell and threatened them with arrest if they did not leave Jeppesen Terminal. *See* **Exhibit 3**, *January 29, 2017, Video.*

39. Sergeant Quinones handed Mr. Verlo and Ms. McDonnell Regulation 50 and cited it as the reason they would be arrested if they did not leave Jeppesen Terminal. *Id.* Sergeant Quinones told Mr. Verlo and Ms. McDonnell that they would need a permit in order to stand silently, holding signs in opposition of the Muslim Ban and be in compliance with Regulation 50.

40. Had Mr. Verlo and Ms. McDonnell applied for a permit the second President Trump signed the Executive Order implementing the Muslim Ban, they still would have been unable to engage in protest within the Jeppesen Terminal under the terms and conditions of Regulation 50 on January 29, 2017.

41. Mr. Verlo and Ms. McDonnell did not immediately leave the Jeppesen Terminal after being threatened with arrest. However, they were startled by Sergeant Quiones' threat and feared arrest for the duration of the time they were there.

42. Throughout the time Mr. Verlo and Ms. McDonnell were expressing their views within the Jeppesen Terminal they received numerous shows of support from passersby. Multiple self-proclaimed Muslims expressed heart-felt statements of appreciation to Mr. Verlo, Ms. McDonnell, and others holding signs.

43. Mr. Verlo and Ms. McDonnell ultimately left Jeppesen Terminal.

44. Mr. Verlo and Ms. McDonnell wish to return to Jeppesen Terminal to express solidarity with Muslims and opposition to the Muslim Ban, but are reticent to do so for fear of being arrested.

45. Upon information and belief, no individual has been arrested, or threatened with arrest, for wearing a "Make America Great Again" campaign hat without a permit within the Jeppesen Terminal at Denver International Airport.

46. Upon information and belief, no individual has been arrested, or threatened with arrest, for holding a sign welcoming home a member of our military without a permit within the Jeppesen Terminal at Denver International Airport.

47. Upon information and belief, no individual has been arrested, or threatened with arrest, for holding a sign and soliciting passengers for a limousine without a permit within the Jeppesen Terminal at Denver International Airport.

48. Upon information and belief, no individual has been arrested, or threatened with arrest, for discussing current affairs with another person without a permit within the Jeppesen Terminal at Denver International Airport.

49. At all times relevant to this Complaint, Defendants acted under color of law.

## CLAIM I: FIRST AMENDMENT
### (§ 1983 violation – all Defendants)

50. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

51. Regulation 50 violates the Free Speech Clause of the First Amendment to the Constitution, on its face and as applied, because it impermissibly curtails Plaintiffs' free-speech rights.

52. Plaintiffs wish to speak on a matter of public concern.

53. Denver International Airport's Jeppesen Terminal is a public forum.

54. Regulation 50 directly infringes upon and chills reasonable persons from engaging in activity that is protected by the First Amendment.

55. Regulation 50 acts as an unconstitutional prior restraint on speech because it (1) requires a permit before allowing individuals to engage in speech, (2) allows for arbitrary and/or discriminatory permit denials, and (3) requires advance notice that is unconstitutionally excessive.

56. Regulation 50 is overbroad.

57. Regulation 50 is not narrowly tailored to serve a compelling government interest.

58. Regulation 50 does not further a substantial government interest.

59. Regulation 50's restriction on expressive conduct is greater than necessary to further any government interest.

60. Defendants' actions and/or omissions enforcing Regulation 50 caused, directly or proximately, Plaintiffs to suffer damages.

## CLAIM II: FIRST AMENDMENT RETALIATION
### (§ 1983 violation – all Defendants)

1.  All statements of fact set forth previously are hereby incorporated into this claim as though set forth fully herein.

2.  Plaintiffs engaged in First Amendment protected speech on a matter of public concern while displaying signs opposing President Trump's Muslim Ban on January 29, 2017.

3.  Defendants jointly and on their own accord responded to Plaintiffs' First Amendment protected speech with retaliation, including but not limited to threatening Plaintiffs with arrest.

4.  Defendants retaliatory actions were substantially motivated by Plaintiffs' exercise of their First Amendment rights.

5.   By unlawfully threatening Plaintiffs with arrest, Defendants sought to punish Plaintiffs for exercising their First Amendment rights and to silence their future speech. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

6.   Defendants' actions and/or omissions enforcing Regulation 50 caused, directly and proximately, Plaintiffs to suffer damages.

## CLAIM III: FOURTEENTH AMENDMENT DUE PROCESS
### (§ 1983 violation – all Defendants)

7.   All statements of fact set forth previously are hereby incorporated into this claim as though set forth fully herein.

8.   The prohibitions of Regulation 50 are vague and not clearly defined.

9.   Regulation 50 offers no clear and measurable standard by which Plaintiffs and others can act lawfully.

10. Regulation 50 does not provide explicit standards for application by law enforcement officers.

11. Regulation 50 fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, and authorizes or encourages arbitrary and discriminatory enforcement, or both.

12. Defendants' actions and/or omissions enforcing Regulation 50 caused, directly and proximately, Plaintiffs to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant:

(a)      Appropriate declaratory and other injunctive and/or equitable relief;

(b)     Enter a declaration that Regulation 50 is unconstitutional on its face and enjoin its enforcement;

(c)     Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     All economic losses on all claims allowed by law;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)     Attorney's fees and the costs associated with this action, pursuant to 42 U.S.C. § 1988;

(g)     Pre and post-judgment interest at the lawful rate; and

(h)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

Dated this 6th day of February 2017.

KILLMER, LANE & NEWMAN, LLP


*s/ Andy McNulty*
_____
David A. Lane
Andy McNulty
Killmer, Lane & Newman, LLC
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
amcnulty@kln-law.com

*Attorneys for Plaintiff*