**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

NAZLI MCDONNELL,
ERIC VERLO,

Plaintiffs,

vs.

CITY AND COUNTY OF DENVER,
DENVER POLICE COMMANDER ANTONIO LOPEZ, in his individual and official capacity,
DENVER POLICE SERGEANT VIRGINIA QUINONES, in her individual and official capacity,

Defendants.

---

**MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiffs, by and through their attorneys David A. Lane and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby submit the following Motion for Preliminary Injunction, and in support thereof, states as follows:

**1. Introduction**

Over the last four days, many Americans have expressed public disapproval of President Donald Trump's January 27, 2017, Executive Order, which permanently bans Syrian refugees from emigrating to the United States, temporarily bans nationals of seven countries (including permanent legal residents and visa-holders), and suspends all applications to the United States refugee program (even as to vetted entrants currently in transit). Plaintiffs are concerned and alarmed United States citizens who wish to join the growing chorus of voices expressing

opposition to the Executive Order. To do so, they wish to stand in silent protest at the Jeppesen Terminal within Denver International Airport.

Plaintiffs did just this on January 29, 2017, standing in silent protest of the Executive Order outside of the secure Customs and Border Protection (hereinafter "CBP") screening area within Jeppesen Terminal. Almost immediately, Plaintiffs were threatened with arrest by Denver Police Department Sergeant Virginia Quinones for standing silently and holding signs opposing the Executive Order, despite that fact that the Jeppesen Terminal has previously been used for expressive activity (and that protesters at more than ten major airports nationwide have protested peacefully without major disruption or legal restriction). While silently displaying their signs, Plaintiffs were in the plaza within the Jeppesen Terminal and positioned significantly behind the railing, which demarcates where those waiting for loved ones are permitted to stand, in the open plaza outside of the secure CBP screening area at the Jeppesen Terminal. Plaintiffs did not impede the right of way of any passengers hustling to catch flights at the last moment. They simply stood with placards showing their distaste for the Executive Order and the man who executed it.

Even though Plaintiffs were simply engaged in peaceful First Amendment protected expression, they were threatened with arrest. Sergeant Quinones informed Plaintiffs that, in order to stand silently with political signs, they would need a permit. Without a permit, Sergeant Quinones stated, all "First Amendment expression" at the Denver International Airport was banned.

This was not the first time since the enactment of the Executive Order that the Denver Police Department threatened individuals with arrest for engaging in First Amendment protected activity in Jeppesen Terminal. On January 28, 2016, a protest was held in the plaza of Jeppesen

Terminal. During the protest, Denver Police Commander Antonio Lopez instructed multiple individuals, including State Representative Joseph Salazar and representatives from the ACLU of Colorado, that all "First Amendment expression" was banned at Denver International Airport without a permit. *See* **Exhibit 1**, *January 28, 2017, Video 1*; **Exhibit 2**, *January 28, 2017, Video 2*. The protesters had, in fact, applied for a permit earlier that day. However, it had not been granted because they had not done so seven days in advance of the protest in compliance with Denver International Airport regulations. Although no arrests were ultimately made, protesters were threatened numerous times by Commander Lopez, and other officers, with arrest.

The Denver International Airport regulation that both Sergeant Quinones and Commander Lopez relied upon in instructing Plaintiffs, and others, that Denver International Airport bans all "First Amendment expression" without a permit is DENVER INTERNATIONAL AIRPORT REGULATION 50 (hereinafter "Regulation 50"). Regulation 50 states that "no person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee." DENVER INTERNATIONAL AIRPORT REGULATION 50.03. In order to obtain a permit, an individual must "complete a permit application and submit it during regular business hours, at least seven (7) days prior to the commencement of the activity for which the permit is sought[.]" DENVER INTERNATIONAL AIRPORT REGULATION 50.04-1.

Plaintiffs wish to return to Denver International Airport to protest the Executive Order, but are reasonably frightened of arrest and, absent action by this Court, must choose between lawfully exercising their First Amendment right and being subject to arrest and/or prosecution.

Plaintiffs ask that this Court enter an injunction prohibiting their arrest for standing in peaceful protest within Jeppesen Terminal and invalidating Regulation 50 as violative of the First and Fourteenth Amendments to the United States Constitution.

**2. Factual Background**

All statements of fact set forth in the simultaneously filed Complaint are hereby incorporated into this Brief as though set forth fully herein.

**3. Argument**

**3.1 The standard for issuance of a preliminary injunction.**

When seeking a preliminary injunction, a plaintiff must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm; (3) the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also ACLU v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999).

The Tenth Circuit has modified the preliminary injunction test when the moving party demonstrates that the second, third, and fourth factors "tip strongly" in its favor. *See Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006); *see also* 820 F.3d 1113, n.5 (10th Cir. 2016). "In such situations, the moving party may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Id.* (internal quotation marks omitted). Moreover, this "fair chance of prevailing" test is appropriate in this case because Plaintiffs are challenging a policy, not a statue or ordinance. *See Planned Parenthood Minn, N.D., & S.D. v. Rounds*, 530 F.3d 724, 732 (9th Cir. 2008) ("[C]ourts should... apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes.").

Under either standard, Plaintiffs are able to demonstrate that the issuance of a preliminary injunction is appropriate in this matter.

**3.3 Regulation 50 implicates Plaintiffs' First Amendment rights.** [1]

When the government regulates the exercise of First Amendment rights, the burden is on the proponent of the restriction to establish its constitutionality. *Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013). Moreover, when assessing the preliminary injunction factors in First Amendment cases, "the likelihood of success will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). This is because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably, constitutes irreparable injury," *Heideman v. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003), and it is invariably in the public interest to protect an individual's First Amendment rights. *See Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (noting that "the public interest is better served" by protecting First Amendment rights).

**3.4 Plaintiffs are likely to succeed on the merits.**

Plaintiffs are likely to succeed on the merits because Regulation 50 violates the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment.

**3.4(a) Plaintiffs engaged, and wish to engage, in speech on a matter of public concern.**

Plaintiffs' speech is at the core of the First Amendment's protection because it deals with a matter of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value

[1] It is important to note that facial challenges to government policies and statutes, when based on First and Fourteenth Amendment grounds, are not disfavored. *See United States v. Stevens*, 559 U.S. 460, 473 (2010); *City of Chicago v. Morales*, 527 U.S. 41 (1999).

and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citation omitted). "Speech on matters of public concern is at the heart of the First Amendment's protection." *Id*. at 451-52 (alterations and quotation marks omitted). "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id*. at 452 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Plaintiffs wish to engage in expression about President Donald Trump's January 27, 2017, Executive Order, a topic that has generated nearly unprecedented debate and dissent. *See* Adrienne Mahsa Varkiani, *Here's Your List of All the Protests Happening Against the Muslim Ban*, THINK PROGRESS (Jan. 28, 2017), https://thinkprogress.org/muslim-ban-protests-344f6e66022e#.ft1oznfv4 (compiling list of direct actions planned in response to President Trump's January 27, 2017, Executive Order). Thus, Plaintiffs' speech "'occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Snyder*, 562 U.S. at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

**3.4(b) Regulation 50 acts as a prior restraint.**

The restriction at issue in this matter is a prior restraint. "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984)). Regulation 50 is in an administrative order that forbids future communication and bases the ability to communicate in the future on the discretion of an administrative official. *See* DENVER INTERNATIONAL AIRPORT REGULATION 50.03 ("no person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related

activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, *except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee*." (emphasis added)). It is a prior restraint.

The burden of proving a prior restraint is permissible is particularly steep. The Supreme Court has repeatedly held that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). For the reasons outlined *infra*, Defendants cannot meet this especially significant burden.

**3.4(c) Jeppesen Terminal, outside of the passenger security zones, is a traditional public forum.**

The Supreme Court has not definitively decided whether airport terminals, including Jeppesen Terminal, are public forums. In *Lee v. International Society for Krishna Consciousness, Inc*., 505 U.S. 830 (1992) (hereinafter "*Lee I*"), issued the same day as *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (hereinafter "*Lee II*"), the Supreme Court struck down a total ban on distribution of literature in airports. In *Lee I*, the Court issued a one sentence per curiam opinion, which affirmed the Second Circuit for the reasons expressed by Justice O'Connor, Justice Kennedy, and Justice Souter in *Lee II*. *See Lee I*, 505 U.S. at 831. Justice Kennedy and Justice Souter's opinions in *Lee II* found that "airport corridors and shopping areas outside of the passenger security zones... are public forums, and speech in those places is entitled to protection against all government regulation inconsistent with public forum principles." *Lee II*, 505 U.S. at 693 (Kennedy, J., concurring in the judgment); *but see Lee II*, 505 U.S. at 683 ("”[W]e think that neither by tradition nor purpose can the terminals be described as satisfying the standards we have previously set out for identifying a public forum.").

Therefore, Plaintiffs ask this Court to find the area of Jeppesen Terminal outside of the passenger security zones to be a public forum. The historical use of the Jeppesen Terminal's plazas and other areas outside of the passenger security zones (including the area outside of the secure CBP screening area) for political speech (particularly, the history of welcoming of American military personnel home from service, discussion between passengers of matters of public concern, and display of clothing advocating for political views and ideals) indicates that it is a public forum. *See First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1130 (10th Cir. 2002) (“Where courts have considered the traditional use of publicly accessible property for speech, they have refused to attribute legal significance to an historical absence of speech activities where that non-speech history was created by the very restrictions at issue in the case.”). Further, that the Jeppesen Terminal is free and open to the public (outside of the passenger security zones), illustrates that it is a public forum. *See, e.g., Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 676 (1998); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800, 805, 809 (1985). Finally, Jeppesen Terminal retains characteristics similar to parks: it has large plazas lined with benches, it is surrounded by businesses which are open to the public, and it has dedicated walkways, similar to sidewalks, indicating that it is a public forum. *See e.g., Frisby v. Schultz,* 487 U.S. 474, 480-481 (1988); *United States v. Grace*, 461 U.S. 171, 177 (1983). Further, the Supreme Court has not strictly limited the public forum category to streets, sidewalks, and parks. *See, e.g., Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (finding leased municipal theater is a public forum); *Heffron v. Int'l Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (finding state fair is a public forum); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (finding grounds of state capitol are a traditional public forum). Even if the City claims that it has never intended for Jeppesen Terminal to be a public forum,

this is not dispositive. *See Lee*, 505 U.S. at 830 (government policy prohibiting distribution of literature at airport on property struck down); *Cornelius*, 473 U.S. at 805 (government's decision to limit access is not itself dispositive). Plaintiffs' ask that this Court find Jeppesen Terminal, outside of the passenger security zones, a traditional public forum.

Since Jeppesen Terminal is a traditional public forum, any restriction on Plaintiffs' speech must be content-neutral and narrowly tailored to a compelling government interest. Regulation 50 fails at both.

**3.4(d) Regulation 50 is content-based.**

Regulation 50 is a content-based restriction of expression. Although the Supreme Court has long held that content-based restrictions elicit strict scrutiny, *see*, *e.g.*, *Carey v. Brown*, 447 U.S. 455 (1980), lower courts diverged on the meaning of "content-based" until *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).[2] *Reed* clarified that a restriction is content based simply if it draws distinctions "based on the message a speaker conveys." 135 S. Ct. at 2227. *Reed* is clear that even "subtle" distinctions that define regulated expression "by its function or purpose . . . are distinctions based on the message a speaker conveys, and therefore, are subject to strict scrutiny." *Id*. This accords with *Texas v. Johnson*, which held that "the emotive impact of speech on its audience is not a secondary effect unrelated to the content of the expression itself." 491 U.S. 491 U.S. 297, 412 (1989) (internal quotations omitted).

Regulation 50 is content-based on its face. It distinguishes between content and requires that an official determine the content of the speaker's message when enforcing its proscriptions. *Reed*, 135 S. Ct. at 2227; *see* DENVER INTERNATIONAL AIRPORT REGULATION 50.03 ("No person

[2] *Reed* involved a municipal "sign code" that regulated signs differently based on the kind of message they conveyed (such as "ideological," "political," or "temporary directional"). 135 S. Ct. at 2224-25. The Court rejected the city's argument that a law had to discriminate against certain viewpoints in order to be a content-based restriction. *Id.* at 2229.

or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport *for religious*, *charitable*, *or political purposes*, *or in connection with a labor dispute*[.]" (emphasis added)). The distinctions drawn by Regulation 50 make it a facially content-based restriction on expression that must elicit "the most exacting scrutiny." *Johnson*, 491 U.S. at 412; *Reed*, 135 S. Ct. at 2227.

**3.4(e) Regulation 50 is not narrowly tailored to serve a compelling government interest.**

As a facially content-based restriction of expression at traditional public fora, Regulation 50 is presumptively unconstitutional unless Defendant "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 St. Ct. at 2231; *accord Johnson*, 491 U.S. at 412.

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted). Regulation 50 reaches more speech than that which would impair the security of the airport or ensure that passengers are not unduly encumbered. In fact, it completely bans all "First Amendment expression." "A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Id*.. Regulation 50 is not such a ban. For instance, Plaintiffs' expression does nothing to jeopardize security at Denver International Airport or to inhibit the free flow of passengers through the airport.

Further, any argument that Plaintiffs can engage in expressive activity in another location lacks merit, as the Supreme Court has held that the First Amendment is violated when one specific location or audience, when important to the speaker, is foreclosed. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014); *Schenck v. Pro-Choice Network*, 519 U.S. 357, 377 (1997) (invalidating a "floating" buffer zone around people entering an abortion clinic partly on

the ground that it prevented protestors "from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks"); *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939) (invalidating anti-handbilling ordinances even though "their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places"). Regulation 50 lacks the narrow tailoring necessary to survive First Amendment strict scrutiny analysis.

**3.4(f) Regulation 50 violates the First Amendment even if this Court determines Jeppesen Terminal is a nonpublic forum.**

Regulation 50 bans all "First Amendment expression" absent a permit; it is unconstitutional even when analyzed under the lower standard of scrutiny applied by courts to First Amendment political speech in a nonpublic forum. In *Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), the Supreme Court considered whether a resolution restricting free speech in the airport was constitutional. The resolution at issue stated that the airport "is not open for First Amendment activities by any individual and/or entity." *Id*. at 574. Although the Court did not explicitly find that the airport was a nonpublic forum, it did hold that the resolution restricting speech in the airport was facially unreasonable, even if the airport was a nonpublic forum. *Id*. at 573. The Court noted that enforcing the resolution would prohibit "talking and reading, or the wearing of campaign buttons or symbolic clothing." *Id*. at 574. The Court also noted, "[m]uch nondisruptive speech--such as the wearing of a T-shirt or button that contains a political message--may not be 'airport related' but is still protected speech even in a nonpublic forum." *Id*.at 575 (citing *Cohen v. California*, 403 U.S. 15 (1971) (holding that wearing of jacket with offensive language in a courthouse was a form of nondisruptive expression that was protected by the First Amendment)). Thus, although specific conduct was not at issue in the *Jews for Jesus* decision, the Court nonetheless implicitly

held that non-disruptive speech is protected by the First Amendment in nonpublic fora and that restrictions that encumber non-disruptive expression are unreasonable.

In *Lee II*, Justice O'Connor set forth the test for determining reasonableness in the context of nonpublic fora. 505 U.S. at 687 (O'Connor, J., concurring).[3] She stated, "[t]he reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Id*. (O'Connor, J., concurring) (quoting *Cornelius*, 473 U.S. at 809). However, Justice O'Connor noted that while "[o]rdinarily . . . we have . . . been confronted with cases where the fora at issue were discrete, single-purpose facilities," airports present a different analysis because they are *multipurpose facilities*. *Id*. at 688 (O'Connor, J., concurring) (citations omitted). She determined airports to be multipurpose facilities because

> the Port Authority [has] chosen *not* to limit access to the airports under its control, [and] has created a huge complex open to travelers and nontravelers alike. The airports house restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, telegraph offices, clothing shops, drug stores, food stores, nurseries, barber shops, currency exchanges, art exhibits, commercial advertising displays, bookstores, newsstands, dental offices and private clubs.

*Id*. This led to the finding that "[t]he reasonableness inquiry, therefore, is not whether the restrictions on speech are consistent with preserving the property for air travel, but whether they are reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created." *Id*. at 689. A complete ban on First Amendment activity at the Jeppesen Terminal, absent a permit that must be obtained by providing seven days advance notice, is not a reasonable restriction. Regulation 50 does not comport with Justice O'Connor's conclusion that airports are more than simply places where air travel occurs.

[3] It is important to note that *Lee* involved a plurality opinion, joined by Justice O'Connor. Therefore, Justice O'Connor's concurrence is the "narrowest grounds" that justify the Court's result and her concurrence holds substantial precedential weight.

Moreover, Justice O'Connor distinguished between solicitations (which the Supreme Court found could be reasonably restricted) and distributing leaflets (which the Supreme Court found could not be reasonably restricted) in the airport:

> [L]eafleting does not entail the same kinds of problems presented by face-to-face solicitation. Specifically, "one need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand . . . . The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time."

*Id*. at 690 (quoting *United States v*. *Kokinda*, 497 U.S. 720, 734 (1990)).

Thus, the Court held in *Lee II* that prohibiting solicitation in a nonpublic forum is not unreasonable, but that prohibiting the distribution of leaflets and other literature at a nonpublic forum is unreasonable. *See also Lee*, 505 U.S. at 830 (decided the same day as *Lee II* and striking down a prohibition on the distribution of leaflets and other literature at La Guardia, John F. Kennedy, and Newark International airports) (per curiam). Circuit courts have also recognized the inherent right to distribute paper and other information in nonpublic fora. Following *Lee I* and *Lee II*, two circuit courts have held that airports, as nonpublic fora, could not preclude newspaper publishers from placing newsracks in airport terminals. *See Jacobsen v*. *City of Rapid City*, *South Dakota*, 128 F.3d 660 (8th Cir. 1997); *Multimedia Publishing Co*. *of South Carolina*, *Inc*. *v*. *Greenville-Spartanburg Airport Dist*., 991 F.2d 154 (4th Cir. 1993). To the extent that the airports were concerned about safety or the impediment of traffic flow, the courts held that the airport may impose reasonable restrictions, but they could not enforce an outright ban on the newspaper racks. *See Jacobsen*, 128 F.3d at 660; *Multimedia Publishing Co*. *of South Carolina*, *Inc*., 991 F.2d at 154.

Denver, through Regulation 50, has banned all "First Amendment expression" including leafleting and protests. In fact, Plaintiffs expression is arguably less intrusive and disruptive to

air travel than the form of expression, namely leafletting, that the Court held could not be reasonably restricted in the areas of an airport that precede the security screening area. It is clear from *Lee I*, *Lee II*, and *Jews for Jesus* that Denver cannot ban all "First Amendment expression" at the Jeppesen Terminal.

**3.4(f)(1) Independently, the viewpoint-based prohibition of Plaintiffs' speech, based on Regulation 50, violates the First Amendment.**

Even if Jeppesen Terminal is a nonpublic forum, "this does not mean the government has unbridled control over speech, . . . for it is axiomatic that 'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. *Summum v. Callaghan*, 130 F.3d 906, 916 (10th Cir. 1997) (quoting *Lamb's Chapel v. Center Moriches Union Free School Dist*., 508 U.S. 384, 394, (1993)). "Restrictions on speech in nonpublic fora must be viewpoint neutral[.]" *Warren v. Fairfax Cty*., 196 F.3d 186, 193 (4th Cir. 1999) (citing *Cornelius*, 473 at 809). Defendants' restriction of Plaintiffs' speech, under the guise of Regulation 50, discriminates on the basis of viewpoint. Individuals walk through Denver International Airport with political messages and slogans on their shirts and luggage and discuss politics on a daily basis. Counsel for Plaintiffs has worn political shirts while traveling through Denver International Airport and discussed modern politics with fellow passengers on many occasions. However, no other individual, to Plaintiffs or Plaintiffs' counsel's knowledge, has been threatened with arrest for engaging in this political speech. Nor has any individual been arrested for displaying pro-President Trump messages, for example a red hat that reads "Make America Great Again." Only Plaintiffs' expressive activity against the President's Executive Order, and others advocating similarly, has been threatened with arrest. Regulation 50 is being enforced as a clearly view-point based restriction. Defendants' application of Regulation 50 to Plaintiffs speech is view-point based and violates the First Amendment.

**3.4(g) The seven day advance notice requirement for obtaining a permit is not a reasonable restriction.**

Notice periods restrict spontaneous free expression and assembly rights safeguarded in the First Amendment. Plaintiffs, like many others throughout history, wish to engage in First Amendment expression in quick response to topical events. While even in such time-sensitive situations, a municipality may require some short period of advance notice so as to allow it time to take measures to provide for necessary traffic control and other aspects of public safety, the period can be no longer than necessary to meet the City's urgent and essential needs of this type. *See American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) ("Any notice period is a substantial inhibition on speech.").

Advance notice requirements that have been upheld by courts have most generally been less than a week. *See, e.g., A Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C. Cir. 1975) (two-day advance notice requirement is reasonable for use of National Park areas in District of Columbia for public gatherings); *Powe v. Miles*, 407 F.2d 73, 84 (2d Cir. 1968) (two-day advance notice requirement for parade is reasonable); *Progressive Labor Party v. Lloyd*, 487 F. Supp. 1054, 1059 (D. Mass. 1980) (three-day advance filing requirement for parade permit approved in context of broader challenge); *Jackson v. Dobbs*, 329 F. Supp. 287, 292 (N.D. Ga. 1970) (marchers must obtain permit by 4 p.m. on day before the march), aff'd, 442 F.2d 928 (5th Cir. 1971). Lengthy advance filing requirements for parade permits, such as the seven day advance notice requirement imposed by Regulation 50, have been struck down as violating the First Amendment. *See American-Arab Anti-Discrimination Comm.*, 418 F.3d at 605-07 (holding that provision requiring thirty days' notice is overbroad and is not saved by an unwritten policy of waiving the provision); *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) ("[A]ll available precedent suggests that a 20-

day advance notice requirement is overbroad.”). Even an advance filing requirement of five days has been held too long to comport with the First Amendment. *See Douglas v. Brownell*, 88 F.3d 1511, 1523-24 (8th Cir. 1996) (city’s asserted goals of protecting pedestrian and vehicular traffic and minimizing inconvenience to the public does not justify five-day advance filing requirement for any parade, defined as ten or more persons).

It is clear that, in the case at bar, a permit requirement of seven days advance notice is not a reasonable restriction of Plaintiffs’ First Amendment rights. Plaintiffs wish to engage in timely, direct action against, what they perceive as, a tyrannical and unconstitutional exercise of the executive power. If Plaintiffs were to have applied for a permit at the exact moment President Trump signed the Executive Order, they would still have been prevented from engaging in First Amendment activity on January 29, 2017. In direct action, like in most things, timing is everything. As evidenced by myriad protests that occurred across the nation’s airports, which were accompanied by no violence or destruction of property and did not otherwise jeopardize security, accommodation of protest at the Jeppesen Terminal is reasonable. Such a lengthy approval period, with no exceptions for spontaneous, peaceful protests, violates the First Amendment. *See Church of the American Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003) (noting that “the length of the required period of advance notice is critical to its reasonableness; and given … that political demonstrations are often engendered by topical events, a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech” (emphasis added)).

**3.4(h) Regulation 50 is overbroad in violation of the First Amendment.**

“[A] law may be invalidated as overbroad if ‘a substantial number of its applications are unconstitutional, judged in relation to the [ordinance]’s plainly legitimate sweep.’” *United States*

*v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). An overbroad statute may be challenged on its face even though a more narrowly drawn statute would be valid as applied to the party in the case before it. *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984) ("[B]roadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected."). The Supreme Court "has repeatedly held that a government purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 307 (1964); *see also Grayned v. City of Rockford*, 408 U.S. 109, 114-15 (1972) ("The crucial question, then, is whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."). Courts have "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

Determining whether a law is substantially overbroad requires a two-step analysis. First, a court must "construe the challenged [law]; it is impossible to determine whether a [law] reaches too far without first knowing what the [law] covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Second, based on the first step, a court must determine whether the law "criminalizes a substantial amount of protected expressive activity." *Id.* at 297.

Regulation 50 provides that "no person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with

a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee." Those tasked with enforcing Regulation 50, have stated that it bans all "First Amendment expression." *See* **Exhibit 1**, *January 28, 2017, Video 1*; **Exhibit 2**, *January 28, 2017, Video 2*.

A complete prohibition on First Amendment expression and related activity proscripts a substantial amount of protected expressive activity. *See Jews for Jesus*, 482 U.S. at 569; *Lee*, 505 U.S. at 830. It prohibits face-to-face conversations and wearing clothing intended to convey a message, along with leafleting and other traditional First Amendment activity, all of which protected expression. Regulation 50's overbreadth is stark and violates the guarantees of the First Amendment.

**3.4(i) Regulation 50 is unconstitutionally vague.**

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). "A law's failure to provide fair notice of what constitutes a violation is a special concern where laws 'abut[ ] upon sensitive areas of basic First Amendment freedoms' because it 'inhibit[s] the exercise' of freedom of expression and 'inevitably lead[s] citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.'" *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) (quoting *Grayned*, 408 U.S. at 109). For this reason, a stringent vagueness test applies to a law that interferes with the right of free speech. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment,

the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

Regulation 50 is vague, and therefore unconstitutional, for two separate reasons. First, Regulation 50 fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). A law is unconstitutionally vague where it "does not provide people with fair notice of when their actions are likely to become unlawful." *Stahl*, 687 F.3d at 1041. Because violators of Regulation 50 are subject to criminal sanction, the strictest vagueness test applies. *See Reno v. ACLU*, 521 U.S. 844, 872 (1997) (recognizing criminal sanctions might "cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images" which, together with the "'risk of discriminatory enforcement' of vague regulations, poses greater First Amendment concerns than those implicated by [a] civil regulation[.]"). Whether expressive activity will be deemed "First Amendment expression" in the Jeppesen Terminal is not predictable. Plaintiffs have reasonably refrained from protected speech for fear that someone might consider their expression to be in violation of the regulation. However, officials have failed to enforce the regulation against many others who are seemingly in violation, including those discussing politics with other passengers, wearing clothing meant to make some social or political statement, limo drivers soliciting passengers, and those welcoming home military veterans. Although there might be times when a speaker knows, or should know, that certain speech will violate the statute, in many situations such an effect is difficult or impossible to predict. *See Stahl*, 687 F.3d at 1041 (finding vagueness because even "[t]hough there are certainly times when a speaker knows or should know that certain speech or activities likely will cause a traffic

problem, in many situations such an effect is difficult or impossible to predict.”). Regulation 50 fails to give fair notice and therefore violates the mandates of the Fourteenth Amendment.

Regulation 50 is also unconstitutionally broad because it “authorize[s] and even encourage[s] arbitrary and discriminatory enforcement.” *Morales*, 527 U.S. at 56. Regulation 50’s terms allow law enforcement officials wide discretion to decide whether any given speech is prohibited and arrest the speaker. “Such a statute does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.” *Cox v. Louisiana*, 379 U.S. 536, 579 (1965); *see Norton v. Discipline Comm. of E. Tenn. State Univ.*, 399 U.S. 906, 909 (1970) (“Officials of public universities . . . are no more free than policemen or prosecutors to punish speech because it is rude or disrespectful, or because it causes in them vague apprehensions, or because for any other reason they do not like its content.”).

Officers have been observed enforcing Regulation 50 against those protesting President Trump’s Executive Order, but not against those wearing other political shirts or buttons. Officers have not enforced the regulation against other political expression, including those standing in support of military veterans returning home from combat. Seemingly, the only ones who have been subject to this regulation are those who are specifically speaking against President Trump’s Executive Order. “The most meaningful aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement.” *Smith*, 415 U.S. at 574. Because the terms allow a police officer leeway to determine that expressive conduct is lawful, or not, they are vague. Regulation 50 permits “a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.” *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (internal citations omitted). It is unconstitutional.

**3.5 Absent an injunction, Plaintiffs will suffer irreparable harm.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016); *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016).

Moreover, Plaintiffs' expression is a time-sensitive response to a nearly unprecedented action by our federal government. *But see* C. Norwood, *A Twitter Tribute to Holocaust Victims*, THE ATLANTIC (January 27, 2017), https://www.theatlantic.com/politics/archive/2017/01/jewish-refugees-in-the-us/514742/ (describing the rebuff of refugees fleeing Nazi Germany in 1939, many of whom would be murdered during the Holocaust); *Korematsu v. United States*, 323 U.S. 214 (1944). Delaying Plaintiffs' protest, and discouraging Plaintiffs and others from demonstrating, detracts from its importance and provides a false appearance that Denver is not like other cities of all sizes across the country that have mustered sizeable protests at their airports. Denver has held itself out as a "sanctuary city." Jon Murray, *Mayor Hancock says he welcomes "sanctuary city" title if it means Denver supports immigrants and refugees*, The DENVER POST (January 30, 2017), http://www.denverpost.com/2017/01/30/mayor-hancock-welcomes-sanctuary-city-title-denver-supports-immigrants-refugees/. For Colorado's citizens to seemingly show lackluster support in this time of trial would not only irreparable harm Plaintiffs, and others, but it would go against the public interest.

**3.6 The balance of the equities weighs in favor of granting a preliminary injunction.**

"The balance of equities… generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012). Courts have consistently held that when First Amendment freedoms are threatened, the balance of the equities weighs in the Plaintiffs' favor. *See Verlo*, 820 F.3d at 1127; *Awad*, 670 F.3d at 1132. There is no harm to Defendant, who has no significant interest in the enforcement of Regulation 50 since it is likely unconstitutional.

**3.7 A preliminary injunction is in the public interest.**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1133 (internal quotation marks omitted); *accord Verlo*, 820 F.3d at 1127; *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); *Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values").

**4. Conclusion**

For the reasons stated, Plaintiffs respectfully request that this Court grant their Motion for a Preliminary Injunction, enjoin enforcement of Regulation 50, and prohibit Defendants from arresting Plaintiffs and all others similarly situated when they engage in First Amendment protected activity within Jeppesen Terminal.

Dated this 6th day of February, 2017

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

David Lane
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiffs*