**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-0332-WJM-MJW

NAZLI MCDONNELL, and
ERIC VERLO,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
DENVER POLICE COMMANDER ANTONIO LOPEZ, in his individual and official
capacity, and
DENVER POLICE SERGEANT VIRGINIA QUIÑONES, in her individual and official
capacity,

      Defendants.

---

## ORDER GRANTING PRELIMINARY INJUNCTION IN PART

---

Plaintiffs Nazli McDonnell ("McDonnell") and Eric Verlo ("Verlo") (together, "Plaintiffs") sue the City and County of Denver ("Denver"), Denver Police Commander Antonio Lopez ("Lopez") and Denver Police Sergeant Virginia Quiñones ("Quiñones") (collectively, "Defendants") for allegedly violating Plaintiffs' First and Fourteenth Amendment rights when they prevented Plaintiffs from protesting without a permit in the Jeppesen Terminal at Denver International Airport ("Airport" or "Denver Airport").  (ECF No. 1.)  Currently before the Court is Plaintiffs' Motion for Preliminary Injunction, which seeks to enjoin Denver from enforcing some of its policies regarding demonstrations and protests at the Airport.  (ECF No. 2.)  This motion has been fully briefed (*see* ECF Nos. 2, 20, 21, 23) and the Court held an evidentiary hearing on February 15, 2017 ("Preliminary Injunction Hearing").

For the reasons explained below, Plaintiffs' Motion is granted to the following limited extent:

- Defendants must issue an expressive activity permit on twenty-four hours' notice in circumstances where an applicant, in good faith, seeks a permit for the purpose of communicating topical ideas reasonably relevant to the purposes and mission of the Airport, the immediate importance of which could not have been foreseen seven days or more in advance of the commencement of the activity for which the permit is sought, or when circumstances beyond the control of the permit applicant prevented timely filing of the application;

- Defendants must make all reasonable efforts to accommodate the applicant's preferred demonstration location, whether inside or outside of the Jeppesen Terminal, so long as the location is a place where the unticketed public is normally allowed to be;

- Defendants may not enforce Denver Airport Regulation 50.09's prohibition against "picketing" (as that term is defined in Denver Airport Regulation 50.02-8) within the Jeppesen Terminal; and

- Defendants may not restrict the size of a permit applicant's proposed signage beyond that which may be reasonably required to prevent the impeding of the normal flow of travelers and visitors in and out of Jeppesen Terminal; and specifically, Defendants may not enforce Denver Airport Regulation 50.08-12's requirement that signs or placards be no larger than one foot by one foot.

2

Any relief Plaintiffs seek beyond the foregoing is denied at this phase of the

case.  In particular, the Court will not require the Airport to accommodate truly

spontaneous demonstrations (although the Airport remains free to do so); the Court will

not require the Airport to allow demonstrators to unilaterally determine the location

within the Jeppesen Terminal that they wish to demonstrate; and the Court will not

strike down the Airport's usual seven-day notice-and-permit requirement as

unconstitutional in all circumstances.

## I.  FINDINGS OF FACT

Based on the parties' filings, and on the documentary and testimonial evidence

received at the evidentiary hearing, the Court makes the following findings of fact for

purposes of resolving Plaintiffs' Motion.

**A.      Regulation 50**

Pursuant to Denver Municipal Code § 5-16(a), Denver's manager of aviation may

"adopt rules and regulations for the management, operation and control of [the] Denver

Municipal Airport System, and for the use and occupancy, management, control,

operation, care, repair and maintenance of all structures and facilities thereon, and all

land on which [the] Denver Municipal Airport System is located and operated."  Under

that authority, the manager of aviation has adopted "Rules and Regulations for the

Management, Operation, Control, and Use of the Denver Municipal Airport System."

*See* https://www.flydenver.com/about/administration/rules_regulations (last accessed

Feb. 16, 2017).  Part 50 of those rules and regulations governs picketing, protesting,

soliciting, and similar activities at the Airport.  *See* https://www.flydenver.com/sites/

3

default/files/rules/50_leafleting.pdf (last accessed Feb. 16, 2017).  The Court will refer to Part 50 collectively as "Regulation 50."

The following subdivisions of Regulation 50 are relevant to the parties' current dispute:

- Regulation 50.03: "No person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO [of the Airport] or his or her designee. . . ."

- Regulation 50.04-1: "Any person or organization desiring to leaflet, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, shall complete a permit application and submit it during regular business hours, at least seven (7) days prior to the commencement of the activity for which the permit is sought and no earlier than thirty (30) days prior to commencement of the activity.  The permit application shall be submitted using the form provided by the Airport.  The applicant shall provide the name and address of the person in charge of the activity, the names of the persons engaged in the activity, the nature of the activity, each location at which the activity is proposed to be conducted, the purpose of the activity, the hours during which the activity is proposed to be conducted, and the beginning and end

4

dates of such activity.  A labor organization shall also identify the employer who is the target of the proposed activity."

- Regulation 50.04-3: "Upon presentation of a complete permit application and all required documentation, the CEO shall issue a permit to the applicant, if there is space available in the Terminal, applying only the limitations and regulations set forth in this Rule and Regulation . . . . Permits shall be issued on a first come-first served basis.  No permits shall be issued by the CEO for a period of time in excess of thirty-one (31) days."

- Regulation 50.04-5: "In issuing permits or allocating space, the CEO shall not exercise any discretion or judgment regarding the purpose or content of the proposed activity, except as provided in these Rules and Regulations.  The issuance of a permit is a strictly ministerial function and does not constitute an endorsement by the City and County of Denver of any organization, cause, religion, political issue, or other matter."

- Regulation 50.04-6: "The CEO may move expressive activity from one location to another and/or disperse such activity around the airport upon reasonable notice to each affected person when in the judgment of the CEO such action is necessary for the efficient and effective operation of the transportation function of the airport."

- Regulation 50.08-12: "Individuals and organizations engaged in leafleting, solicitation, picketing, or other speech related activity shall not: * * * [w]ear or carry a sign or placard larger than one foot by one foot in size . . . ."

5

(underscoring in original).

- Regulation 50.09: "Picketing not related to a labor dispute is prohibited in all interior areas of the Terminal and concourses, in the Restricted Area, and on all vehicular roadways, and shall not be conducted by more than two (2) persons at any one location upon the Airport."

- Regulation 50.02-8: "Picketing shall mean one or more persons marching or stationing themselves in an area in order to communicate their position on a political, charitable, or religious issue, or a labor dispute, by displaying one or more signs, posters or similar devices" (underscoring in original).

The Airport receives about forty-five permit requests a year.  No witness at the Preliminary Injunction Hearing (including Airport administrators who directly or indirectly supervise the permit process) could remember an instance in which a permit had been denied.

Although there is no formal written, prescribed procedure for requesting expedited treatment of permit requests, the Airport not infrequently processes such requests and issues permits in less than seven days.  Last November, less than seven days before Election Day, the Airport received a request from "the International Machinists"[1] to stage a demonstration ahead of the election.  The Airport was able to process that request in two days and thereby permit the demonstration before Election Day.

_____

[1] Presumably, the International Association of Machinists and Aerospace Workers.

6

**B.** **The Executive Order**

On Friday, January 27, 2017, President Trump signed Executive Order 13769

("Executive Order").  *See* 82 Fed. Reg. 8977.  The Executive Order, among other

things, established a 90-day ban on individuals from seven Muslim-majority countries

from entering the United States, a 120-day suspension of all refugee admissions, and

an indefinite suspension of refugee admissions from Syria.  *Id*. §§ 3(c), 5(a), 5(c).  "The

impact of the Executive Order was immediate and widespread.  It was reported that

thousands of visas were immediately canceled, hundreds of travelers with such visas

were prevented from boarding airplanes bound for the United States or denied entry on

arrival, and some travelers were detained."  *Washington v. Trump*, ___ F.3d. ___, ___,

2017 WL 526497, at *2 (9th Cir. Feb. 9, 2017).  As is well known, demonstrators and

attorneys quickly began to assemble at certain American airports, both to protest the

Executive Order and potentially to offer assistance to travelers being detained upon

arrival.

**C.** **The January 28 Protest at the Denver Airport**

Shortly after 1:00 p.m. on the following day—Saturday, January 28, 2017—

Airport public information officer Heath Montgomery e-mailed Defendant Lopez, the

police commander responsible for Denver's police district encompassing the Airport.

Lopez was off-duty at the time.  Montgomery informed Lopez that he had received

media inquiries about a protest being planned for the Airport later that day, and that no

Regulation 50 permit had been issued for such a protest.

Not knowing any details about the nature or potential size of the protest, and

fearing the possibility of "black bloc" and so-called "anarchist activities," Lopez coordinated with other Denver Police officials to redeploy Denver Police's gang unit from their normal assignments to the Airport.  Denver Police also took uniformed officers out of each of the various other police districts and redeployed them to the Airport.  Lopez called for these reinforcements immediately in light of the Airport's significant distance from any other police station or normal patrol area.  Lopez knew that if an unsafe situation developed, he could not rely on additional officers being able to get to the Airport quickly.

Through his efforts, Lopez was eventually able to assemble a force of about fifty officers over "the footprint of the entire airport," meaning inclusive of all officers already assigned to the Airport who remained on their normal patrol duties.  Lopez himself also came out to the Airport.

In the meantime, Montgomery had somehow learned of an organization known as the Colorado Muslim Connection that was organizing protesters through Facebook.  Montgomery reached out to this organization through the Airport's own Facebook account and informed them of Regulation 50's permit requirement.  (Ex. 32.)  One of the Colorado Muslim Connection's principals, Nadeen Ibrahim, then e-mailed Montgomery "to address the permit."  (Ex. 30.)  Ibrahim told Montgomery:

> The group of people we have will have a peaceful assembly
> carrying signs saying welcome here along with a choir and
> lots of flowers.  Our goal is to stand in solidarity with our
> community members that have been detained at the airports
> since the signing of the executive order, though they do
> have active, legal visas/green cards.  Additionally, we would
> like to show our physical welcoming presence for any newly
> arriving Middle Eastern sisters and brothers with visas.  We
> do not intend to block any access to [the Airport].

(*Id.*)  Montgomery apparently did not construe this e-mail as a permit request, or at least not a properly prepared one, and stated that "Denver Police will not allow a protest at the airport tonight.  We are willing to work with you like any other group but there is a formal process for that."  (*Id.*)

Nonetheless, protesters began to assemble in the late afternoon and early evening in the Airport's Jeppesen Terminal, specifically in the multi-storied central area known as the "Great Hall."  The Great Hall is a very large, rectangular area that runs north and south.  The lower level of the Great Hall (level 5) has an enormous amount of floor space, and is ringed with offices and some retail shops, but the floor space itself is largely taken up by security screening facilities for departing passengers.  The only relatively unobstructed area on level 5 is the middle third, which is currently designed primarily as a location for "meeters-and-greeters," *i.e.*, individuals waiting for passengers arriving from domestic flights who come up from the underground train connecting the Jeppesen Terminal with the various concourses.  There is a much smaller meeters-and-greeters waiting area at the north end of level 5, where international arrivals exit from customs screening.

The upper level of the Great Hall (level 6) has much less floor space than level 5 given that it is mostly open to level 5 below.  It is ringed with retail shops and restaurants.  At its north end is a pedestrian bridge to and from the "A" concourse and its separate security screening area.

Given this design, every arriving and departing passenger at the Airport (*i.e.*, all passengers except those only connecting through Denver), and nearly every other person having business at the airport (including employees, delivery persons, meeters-

and-greeters, etc.), must pass through some portion of the Great Hall.  In 2016, the Airport served 58.3 million passengers, making it the sixth busiest airport in the United States and the eighteenth busiest in the world.  Approximately 36,000 people also work at the airport.

The protesters who arrived on the evening of January 28 largely congregated in the middle third of the Great Hall (the domestic-arrivals meeter-and-greeter area).  The protesters engaged in singing, chanting, praying, and holding up signs.  At least one of them had a megaphone.

The size of the protest at its height is unclear.  The witnesses at the evidentiary hearing gave varying estimates ranging from as low as 150 to as high as 1,000.  Most estimates, however, centered in the range of about 200.  Lopez, who believed that the protest eventually comprised about 300 individuals, did not believe that his fifty officers throughout the Airport were enough to ensure safety and security for that size of protest, even if he could pull all of his officers away from their normal duties.

Most of the details of the January 28 protest are not relevant for present purposes.  Suffice it to say that Lopez eventually approached those who appeared to be the protest organizers and warned them multiple times that they could be arrested if they continued to protest without a permit.  Airport administration later agreed to allow the protest to continue on "the plaza," an area just outside the Jeppesen Terminal to its south, between the Terminal itself and the Westin Hotel.  Protesters then moved to that location, and the protest dispersed later in the evening.  No one was arrested and no illegal activity stemming from the protest (*e.g.*, property damage) was reported, nor was there any report of disruption to travel operations or any impeding of the normal flow of

10

travelers and visitors in and out of Jeppesen Terminal.

**D.     The January 29 Protest at the Denver Airport**

Plaintiffs disagree strongly with the Executive Order and likewise wished to protest it, but, due to their schedules, were unable to participate in the January 28 protest.  They decided instead to go to the Airport on the following day, Sunday, January 29.  They came that afternoon and stationed themselves at a physical barrier just outside the international arrival doors at the north end of the Great Hall, level 5. They each held up a sign of roughly poster board size expressing a message of opposition to the Executive Order and solidarity with those affected by it.  (*See* Exs. 2, 4, M.)

Plaintiffs were soon approached by Defendant Quiñones, who warned them that they could be arrested for demonstrating without a permit.  Plaintiffs felt threatened, as well as disheartened that they could not freely exercise their First Amendment rights then and there.  Plaintiffs felt it was important to be demonstrating both at that particular time, given the broad news coverage of the effects of the Executive Order, and at that particular place (the international arrivals area), given a desire to express solidarity with those arriving directly from international destinations—whom Plaintiffs apparently assumed would be most likely to be affected by the Executive Order in some way.

Plaintiffs left the Airport later that day without being arrested, and without incident.  They have never returned to continue their protest, nor have they applied for a permit to do so.

**E.     Permits Since Issued**

The airport has since issued permits to demonstrators opposed to the Executive Order.  At least one of these permits includes permission for four people to demonstrate in the international arrivals area, where Plaintiffs demonstrated on January 29.

## II.  REQUESTED INJUNCTION

Plaintiffs have never proposed specific injunction language.  In their Motion, they asked for "an injunction prohibiting their arrest for standing in peaceful protest within Jeppesen Terminal and invalidating Regulation 50 as violative of the First and Fourteenth Amendments to the United States Constitution."  (ECF No. 2 at 4.)  At the Preliminary Injunction Hearing, Plaintiffs' counsel asked the Court to enjoin Defendants (1) "from arresting people for engaging in behavior that the plaintiffs or people similarly situated were engaging in," (2) from enforcing Regulation 50.09 (which forbids non-labor demonstrators from holding up signs within the Jeppesen Terminal), and (3) from administering Regulation 50 without an "exigent circumstances exception."  Counsel also argued that requiring a permit application seven days ahead of time is unconstitutionally long in any circumstance, exigent or not.

## III.  LEGAL STANDARD

**A.     The Various Standards**

In a sense, there are at least three preliminary injunction standards.  The first, typically-quoted standard requires: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and (4) that

12

the injunction would not adversely affect the public interest.  *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

If, however, the injunction will (1) alter the status quo, (2) mandate action by the defendant, or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits, a second standard comes into play, one in which the movant must meet a heightened burden.  *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).  Specifically, the proposed injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Id.*

On the other hand, the Tenth Circuit also approves of a

> modified . . . preliminary injunction test when the moving party demonstrates that the [irreparable harm], [balance of harms], and [public interest] factors tip strongly in its favor. In such situations, the moving party may meet the requirement for showing [likelihood of] success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.

*Verlo v. Martinez*, 820 F.3d 1113, 1128 n.5 (10th Cir. 2016).  This standard, in other words, permits a weaker showing on likelihood of success when the party's showing on the other factors is strong.  It is not clear how this standard would apply if the second standard also applies.

In any event, *"a preliminary injunction is an extraordinary remedy,"* and therefore "the right to relief must be clear and unequivocal."  *Greater Yellowstone Coal. v.*

*Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

**B.     Does Any Modified Standard Apply?**

The status quo for preliminary injunction purposes is "the last peaceable uncontested status existing between the parties before the dispute developed."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (internal quotation marks omitted).  By asking that portions of Regulation 50 be invalidated, Plaintiffs are seeking to change the status quo.  Therefore they must make a stronger-than-usual showing on likelihood of success and the balance of harms.

## IV.  ANALYSIS

**A.     Irreparable Harm as it Relates to Standing**

Under the circumstances, the Court finds it appropriate to begin by discussing the irreparable harm element of the preliminary injunction test as it relates Plaintiffs' standing to seek an injunction.

Testimony at the Preliminary Injunction Hearing revealed that certain groups wishing to protest the Executive Order have since applied for and obtained permits.  Thus, Plaintiffs *could* get a permit to demonstrate at the airport on seven days' advance notice—although Regulation 50.09 would still prohibit them from demonstrating by wearing or holding up signs.  In addition, as discussed in more detail below (Part IV.B.3.c), Plaintiffs could potentially get a permit to hold a protest parade on public streets in the City and County of Denver with as little as 24 hours' notice.  And as far as the Court is aware, the two Plaintiffs may be able to stand on any public street corner and hold up signs without any prior notice or permit requirement.  Thus, Plaintiffs'

alleged irreparable harm must be one or both of the following: (1) the *prospect* of not being able to demonstrate specifically *at the airport* on less than seven days' notice, or (2) the inability to picket in opposition to the government action they oppose—that is, the inability to hold up "signs, posters or similar devices" while engaging in expressive activity at the airport.  The Court finds that the second of these options is a fairly traditional allegation of First Amendment injury—even if they do apply for and obtain a permit, by the express terms of Regulation 50.09 Plaintiffs will not be allowed to carry or hold up signs, posters, or the like.  The first option, however, requires more extensive discussion and analysis.

The rapidly developing situation that prompted Plaintiffs to go to the Airport on January 29 has since somewhat subsided.  The Executive Order remains a newsworthy topic, but a nationwide injunction now prevents its enforcement, *see Washington*, ___ F.3d at ___, 2017 WL 526497, at *9, and—to the Court's knowledge—none of the most urgent effects that led to airport-based protests, such as individuals being detained upon arrival, have since repeated themselves.  Nonetheless, the circumstances that prompted this lawsuit reveal a number of unassailable truths about "freedom of speech . . . [and] the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  U.S. Const. amend. I.

One indisputable truth is that the *location* of expressive activity can have singular First Amendment significance, or as the Tenth Circuit has pithily put it: "Location, location, location.  It is cherished by property owners and political demonstrators alike." *Pahls v. Thomas*, 718 F.3d 1210, 1216 (10th Cir. 2013).  The ability to convey a message to a particular person is crucial, and that ability often turns entirely on location.

15

Thus, location has specifically been at issue in a number of First Amendment decisions. *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014) (abortion protesters' ability to approach abortion clinic patrons within a certain distance); *Pahls*, 718 F.3d at 1216–17 (protesters' ability to be in a location where the President could see them as his motorcade drove past); *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1218–19 (10th Cir. 2007) (peace activists' ability to be near a hotel and conference center where a NATO conference was taking place); *Tucker v. City of Fairfield*, 398 F.3d 457, 460 (6th Cir. 2005) (labor protesters' ability to demonstrate outside a car dealership); *Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d 205, 207–08 (D. Conn. 2011) (animal rights protesters' ability to protest near a circus), *aff'd sub nom. Zalaski v. City of Bridgeport Police Dep't*, 475 F. App'x 805 (2d Cir. 2012).

Another paramount truth is that the *timing* of expressive activity can also have irreplaceable First Amendment value and significance: "simple delay may permanently vitiate the expressive content of a demonstration." *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984); *see also American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) ("Any notice period is a substantial inhibition on speech."); *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003) ("given that . . . political demonstrations are often engendered by topical events, a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech"); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) ("The five-day notice

requirement restricts a substantial amount of speech that does not interfere with the city's asserted goals of protecting pedestrian and vehicle traffic, and minimizing inconvenience to the public.").

This case provides an excellent example of this phenomena given that—whether intentionally or not—the President's announcement of his Supreme Court nomination on January 31 (four days after signing the Executive Order) permitted the President to shift the media's attention to a different topic of national significance.  Thus, the inability of demonstrators to legally "strike while the iron's hot" mattered greatly in this instance. *Cf. City of Gary*, 334 F.3d at 682 (in the context of a 45-day application period for a parade, noting that "[a] group that had wanted to hold a rally to protest the U.S. invasion of Iraq and had applied for a permit from the City of Gary on the first day of the war would have found that the war had ended before the demonstration was authorized").

These principles are not absolute, however, nor self-applying.  The Court must analyze them in the specific context of the Airport.  But for present purposes, the Court notes that the Plaintiffs' alleged harm of being unable to protest at a specific location on short notice states a cognizable First Amendment claim.  In addition, by its very nature, this is the sort of claim that is "capable of repetition, yet evading review."  *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911).  Here, "the challenged action"—enforcement of the seven-day permit requirement during an event of rapidly developing significance—"was in its duration too short to be fully litigated prior to its cessation or expiration."  *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).  Further, "there [is] a reasonable expectation that the same complaining party would be subjected to the same action again."  *Id*.  More specifically, the Court credits Plaintiffs'

17

testimony that they intend to return to the Airport for future protests, and, given continuing comments by the Trump Administration that new immigration and travel-related executive orders are forthcoming, the Court agrees with Plaintiffs that it is reasonably likely a similar situation will recur—*i.e.*, government action rapidly creating consequences relevant specifically to the Airport.

Thus, although the prospect of being unable to demonstrate at the Airport on short notice is not, literally speaking, an "irreparable harm" (because the need for such demonstration may never arise again), it is nonetheless a sufficient harm for purposes of standing and seeking a preliminary injunction.

The Court now turns to the heart of this case—whether Plaintiffs are likely to succeed on the merits of their claims. Following that, the Court will reprise the irreparable harm analysis in the specific context of the likelihood-of-success findings.

**B.     Likelihood of Success on the Merits**

Evaluating likelihood of success requires evaluating the substantive merit of Plaintiffs' claim that Regulation 50, or any portion of it, violates their First Amendment rights. To answer this question, the Supreme Court prescribes the following analysis:

1.     Is the expression at issue protected by the First Amendment?

2.     If so, is the location at issue a traditional public forum, a designated public forum, or a nonpublic forum?

3.     If the location is a traditional or designated public forum, is the government's speech restriction narrowly tailored to meet a compelling state interest?

4.     If the location is a nonpublic forum, is the government's speech restriction

18

reasonable in light of the purpose served by the forum, and viewpoint

neutral?

*See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797–806 (1985).

The Court will address these inquiries in turn.

### 1.    Does the First Amendment Protect Plaintiffs' Expressive Conduct?

The Court "must first decide whether [the speech at issue] is speech protected

by the First Amendment, for, if it is not, we need go no further." *Id.* at 797.  There

appears to be no contest that the sorts of activities Plaintiffs attempted to engage in at

the Airport (including holding up signs) are expressive endeavors protected by the First

Amendment.  Accordingly, the Court deems it conceded for preliminary injunction

purposes that Plaintiffs are likely to succeed on this element of the *Cornelius* analysis.

### 2.    Is the Jeppesen Terminal a Public Forum (Traditional or Designated)?

The Court must next decide whether the Jeppesen Terminal is a public forum:

> . . . the extent to which the Government can control access
> [to government property for expressive purposes] depends
> on the nature of the relevant forum.  Because a principal
> purpose of traditional public fora is the free exchange of
> ideas, speakers can be excluded from a public forum only
> when the exclusion is necessary to serve a compelling state
> interest and the exclusion is narrowly drawn to achieve that
> interest.  Similarly, when the Government has intentionally
> designated a place or means of communication as a public
> forum[,] speakers cannot be excluded without a compelling
> governmental interest.  Access to a nonpublic forum,
> however, can be restricted as long as the restrictions are
> reasonable and are not an effort to suppress expression
> merely because public officials oppose the speaker's view.

*Id.* at 800 (citations and internal quotation marks omitted; alterations incorporated).

a.    *Is the Jeppesen Terminal a Traditional Public Forum?*

Plaintiffs claim that "[t]he Supreme Court has not definitively decided whether airport terminals . . . are public forums."  (ECF No. 2 at 7.)  This is either an intentional misstatement or a difficult-to-understand misreading of the most relevant case (which Plaintiffs repeatedly cite), *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992) ("*Lee*").

The plaintiffs in *Lee* were disseminating religious literature and soliciting funds at the airports controlled by the Port Authority of New York and New Jersey (JFK, LaGuardia, and Newark).  *Id*. at 674–75.  By regulation, however, the Port Authority prohibited "continuous or repetitive" person-to-person solicitation and distribution of literature.  *Id*. at 675–76.  The Second Circuit held that the airports were not public fora and that the regulation was reasonable as to solicitation but not as to distribution.  *Id*. at 677.  The dispute then went to the Supreme Court, which granted *certiorari* specifically "to resolve whether airport terminals are public fora," among other questions.  *Id*.

The Court answered the public forum question in the negative.  Relying on the historical use of airport terminals generally, the Court found that "the tradition of airport activity does not demonstrate that airports have historically been made available for speech activity."  *Id*. at 680.  "Nor can we say," the Court continued, "that these particular terminals, or airport terminals generally, have been intentionally opened by their operators to such activity; the frequent and continuing litigation evidencing the operators' objections belies any such claim."  *Id*. at 680–81.  Then, invoking the reasonableness test that applies to government regulation of nonpublic fora, the Court

20

affirmed the Second Circuit's holding that the solicitation ban was reasonable. *Id*. at 683–85.

Five justices (Rehnquist, White, O'Connor, Scalia, and Thomas) joined all of the major rulings regarding the solicitation ban, including the nonpublic forum status of airport terminals and the reasonableness of the ban. The outcome regarding the *distribution* ban, however, commanded no majority opinion. Justice O'Connor, applying the reasonableness standard for nonpublic fora, agreed with the Second Circuit that the distribution ban was *not* reasonable. *Id*. at 690–93 (opn. of O'Connor, J.). Justice Kennedy, joined in relevant part by Justices Blackmun, Stevens, and Souter, agreed that the Second Circuit's judgment regarding the distribution ban should be affirmed, but on different grounds, namely, under a strict scrutiny test (because these justices believed that the airport terminals should be deemed a public forum). *Id*. at 708–10 (opn. of Kennedy, J.). The result was that the Second Circuit's invalidation of the distribution ban was affirmed without any opinion commanding a majority view.

Regardless of the outcome with respect to the distribution ban, it is beyond debate that five Supreme Court justices in *Lee* agreed that airport terminals are not public fora. *Id*. at 680–81. The Tenth Circuit has acknowledged this holding. *Mocek v. City of Albuquerque*, 813 F.3d 912, 930 (10th Cir. 2015) ("As an initial matter, an airport is a nonpublic forum, where restrictions on expressive activity need only 'satisfy a requirement of reasonableness.'" (quoting *Lee*, 505 U.S. at 683)). Notably, Plaintiffs have cited no case in which any court anywhere has deemed an airport to be a public forum.

b.      *Is the Jeppesen Terminal a Designated Public Forum?*

Even though the Jeppesen Terminal is not a traditional public forum, Denver

could still designate it as a public forum if Denver "intentionally [opens the Jeppesen

Terminal] for public discourse."  *Cornelius*, 473 U.S. at 802.  Denver denies that it has

done so, and Plaintiffs' arguments to the contrary lack merit.

i.      Terminal Visitors' Incidental Expressive Activities

Plaintiffs argue that visitors to the Jeppesen Terminal "engage in First

Amendment activity; they wear buttons, shirts, and hats that convey distinct messages

to other visitors.  They engage in one-on-one conversations."  (ECF No. 21 at 3.)  Thus,

Plaintiffs say, Denver has designated a public forum within the Jeppesen Terminal.

The Tenth Circuit has already foreclosed this argument.  Addressing the public

forum status of the Denver Performing Arts Complex, the Court stated the following:

"Even if Denver allowed patrons to wear political buttons or shirts with slogans, this

would not be sufficient to establish a designated public forum.  The First Amendment

does not require the government to impose a 'zone of silence' on its property to

maintain its character as a nonpublic forum."  *Hawkins v. City & Cnty. of Denver*, 170

F.3d 1281, 1288 (10th Cir. 1999).

Indeed, even if it wanted to, Denver almost certainly could not impose such a

"zone of silence," as illustrated by *Board of Airport Commissioners of City of Los*

*Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987).  There, the Los Angeles airport

authority adopted a resolution announcing that "the Central Terminal Area at Los

Angeles International Airport [LAX] is not open for First Amendment activities."  *Id*. at

570–71 (internal quotation marks omitted).  The Supreme Court found that this

provision did not "merely reach the activity of [the religious proselytizers who challenged

it]," but also prohibited

> even talking and reading, or the wearing of campaign
> buttons or symbolic clothing.  Under such a sweeping ban,
> virtually every individual who enters LAX may be found to
> violate the resolution by engaging in some "First Amendment
> activit[y]."  We think it obvious that such a ban cannot be
> justified even if LAX were a nonpublic forum because no
> conceivable governmental interest would justify such an
> absolute prohibition of speech.

*Id*. at 574–75.  Thus, the evidence at the Preliminary Injunction Hearing established

beyond any possible dispute that Denver has shown no intent to designate the Airport

as a public forum by allowing speech at that location which it may not disallow in the

first instance.

ii.      The Effect of Regulation 50 Itself

Plaintiffs further argue, "Regulation 50 states that free speech activity is proper

in the Jeppesen Terminal (pursuant to a restriction).  Denver has [thus] designated the

Jeppesen Terminal a public forum for leafleting, conducting surveys, displaying signs,

gathering signatures, soliciting funds, and other speech related activity for religious,

charitable, or political purposes."  (ECF No. 21 at 3–4.)  Although clever, this argument

cannot be correct.[2]

First, the Airport knows from the Supreme Court's *Jews for Jesus* decision, just

discussed, that it cannot prohibit all behavior that can be characterized as First

Amendment-protected expressive activity.

--------

[2] Plaintiffs have unsurprisingly cited no decision from any court adopting their reasoning.

23

Second, the Airport also knows from the *Lee* decision that it likely cannot completely ban some forms of intentional First Amendment communication (such as leafleting) given that the Jeppesen Terminal, like the Port Authority terminals at issue in *Lee*, is a large multipurpose facility that can reasonably accommodate some amount of intentional First Amendment activity.  So, again, the Airport's choice to regulate what it could not prohibit in the first place is not evidence of intent to designate a public forum. *See Stanton v. Fort Wayne-Allen Cnty. Airport Auth.*, 834 F. Supp. 2d 865, 872 (N.D. Ind. 2011) ("[t]he designation of certain free speech zones, along with the permit requirement and limitation of expression to certain times, manners, and places as set forth in the permit, are marks of the Airport Authority's attempt to *restrict* public discourse, and are inconsistent with an intent to designate a public forum" (emphasis in original)).

Third, Plaintiffs' position, if accepted, would likely turn out to chill expressive speech in the long run.  If a government will be deemed to have designated a public forum every time it accommodates citizens' natural desire to engage in expressive activity in a nonpublic forum, governments will likely cut back on such accommodations as far as they are constitutionally allowed.  *Cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (government may un-designate a designated public forum).

          iii.     "Welcome Home" Messages

Plaintiffs finally argue that "[s]ome individuals (who, importantly, are not airlines passengers) hold signs welcoming home loved ones or those returning from overseas

24

deployment." (ECF No. 21 at 3.) The Court will address signs welcoming home veterans and active-duty military members in Part IV.B.3.f, below, and for the reasons stated there finds that this practice, to the extent it exists, does not show intent to designate a public forum. As for welcoming home loved ones, the Court sees no greater religious, charitable, political, or labor-related significance in a typical welcome home sign than standing in the meeter-and-greeter area with a pleasant smile.

In any event, to the extent a welcome home sign has greater significance, "[t]he government does not create a public forum by inaction." *Cornelius*, 473 U.S. at 802. Thus, simple failure to enforce Regulation 50 against such signholders is not itself sufficient to infer that the Airport intended to designate a public forum. And finally, even if the Court were to find such an intent, the Court would still be required to consider whether the Airport only intended to designate a public forum specifically for, *e.g.*, those wishing to convey welcome home messages: "A public forum may be created for a limited purpose such as use by certain groups, or for the discussion of certain subjects." *Perry*, 460 U.S. at 45 n.7 (1983) (citations omitted). Plaintiffs have nowhere addressed this.

For all these reasons, Plaintiffs have failed to demonstrate that the Jeppesen Terminal is a designated public forum.[3]

---

[3] Plaintiffs also attack Regulation 50 as a "prior restraint." (ECF No. 2 at 6–7.) "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, *Nimmer on Freedom of Speech* § 4.03, p. 4-14 (1984)) (emphasis in original). Whether or not that definition could fit Regulation 50, it adds nothing to this case because the Supreme Court's forum analysis provides the governing principles.

3.   Given that the Jeppesen Terminal Is Not a Public Forum, Is Regulation 50 Reasonable in Light of the Purposes Served by the Airport, and Is It Viewpoint-Neutral?

a.   *Reasonableness of the Need for a Permit Submitted in Advance, Generally*

Reasonableness is a fact-intensive inquiry into the "particular nature of the public expression" at issue and "the extent to which it interferes with the designated purposes" of the nonpublic forum.  *Hawkins*, 170 F.3d at 1290.  Justice O'Connor's concurring opinion in *Lee* is significant here, both because of its reasoning and because it has reached the somewhat paradoxical status of a "controlling concurrence."  *See id*. at 1289 ("In actuality, [Justice O'Connor's reasonableness analysis in *Lee*] constitutes only Justice O'Connor's view, who provided the swing vote in the highly-fractured *Lee* decision, but as the narrowest majority holding, we are bound by it.").

In *Lee*, Justice O'Connor noted the Port Authority's airports were not single-purpose facilities (unlike many other locations where the Supreme Court had previously examined speech restrictions).  505 U.S. at 688.  Rather, the airports were "huge complex[es] open to travelers and nontravelers alike," *id*. at 688, and had essentially become "shopping mall[s] as well as . . . airport[s]," *id*. at 689.  The question, then, was whether Port Authority's restrictions were "reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created."  *Id*.

Justice O'Connor's description of the Port Authority Airports aptly describes the Jeppesen Terminal, to an extent.  The Great Hall is lined with restaurants and retail establishments, and in that sense is reminiscent of a shopping mall.  On the other hand, most of the floor space on level 6 is simply the floor space needed to get from location

to location (the equivalent of wide hallways), and most of the floor space on level 5 is dedicated to security screening.  The only large area that is usually free of significant obstructions is the central meeter-and-greeter area—and even that area has at times been taken up by art installations or other features.[4]

Moreover, despite certain characteristics of the Airport that may resemble a shopping mall, the Airport's undisputed primary purpose is to facilitate safe and efficient air travel.  The need for safety hopefully needs no discussion—for decades, airports and airplanes have been the specific target of terrorists.  As for efficiency, the significance of the Great Hall within the Jeppesen Terminal is particularly evident given that it is the node through which every arriving and departing passenger must pass.  As noted, the Airport served 58.3 million passengers last year.  Even assuming that just 20 million (about a third) were arrivals and departures (the remainder being those who connect through without reaching the Jeppesen Terminal), this still comes to more than 55,000 passengers moving through the Great Hall per day, or about 2,300 per hour.  If the Airport could somehow maintain precisely that average over all days and hours of its operation—which of course never happens—it would still be the equivalent of perpetually filling and emptying a large concert hall every hour.

In this light, the Airport's general purposes for requiring demonstrators to apply for a permit in advance are difficult to question.  As stated by the various Airport administrators who testified at the Preliminary Injunction Hearing (Ken Greene, chief operations officer; Patrick Heck, chief commercial officer; and Dave Dalton, assistant

---

[4] Plaintiffs' Exhibit 15, for example, is a photograph of the meeter-and-greeter area in 2008, and shows that a fountain occupied a significant portion of floor space at the time.

director for terminal operations), it is important for the Airport to have advance notice regarding the presence of individuals coming for reasons other than normal airport-related activities, and particularly those who come to the airport intending to attract the attention of passengers and others. The Airport needs an opportunity to determine the appropriate location for a group of the requested size in light of the day(s) and time(s) requested. The permitting requirement also gives the Airport the opportunity to point out Regulation 50's code of conduct (Regulation 50.08), so that demonstrators know what activities are and are not permissible.

In addition, the Airport fairly desires an opportunity to understand the nature of the expressive activity, which can inform whether additional security is needed. As Lopez's testimony illustrates, it is not a simple matter to bring additional police officers to the Airport on a moment's notice. Lopez further pointed out the advantage of understanding the subject matter of the dispute so that he can anticipate whether counter-protesters might arrive and potentially create at least a difficult, if not dangerous, situation.

Importantly, Denver does not need to prove that any particular past event has raised serious congestion or safety concerns: "Although Denver admits that plaintiffs did not cause any congestion problems or major disruption on the particular occasion that they demonstrated . . . , that is not dispositive. '[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum.'" *Hawkins*, 170 F.3d at 1290 (quoting *Cornelius*, 473 U.S. at 810). Thus, the Airport may reasonably require a permit applied for in advance. The Court does not understand Plaintiffs to be arguing to the contrary, *i.e.*, that the Airport is **never** justified in requiring an advance permit under any

28

circumstances.

      b.    *Reasonableness of the Seven-Day Requirement, Specifically*

Plaintiffs *do* attack Regulation 50.03's requirement that permit applications be submitted seven days in advance of the desired activity, apparently arguing that this is unconstitutionally unreasonable in all circumstances.  Given both Plaintiffs' testimony at the Preliminary Injunction Hearing, it is not clear that they would be satisfied by a shorter advance-notice period, nor that it would redress their claimed injury—the inability to protest essentially at a moment's notice on a topical event.  But, to the extent Plaintiffs are challenging the seven-day requirement through the overbreadth doctrine (see Part IV.B.4, below), the Court finds that they have not met their higher burden (or even the normal preliminary injunction burden) to show that they are likely to succeed on proving the seven-day requirement unreasonable in all circumstances.

The Airport's witnesses were not aware of any other airport with a seven-day requirement.  The Indiana airport at issue in the *Stanton* case—which Defendants have relied upon heavily—had a two-day notice requirement, and also a provision by which the airport could accept an application on even shorter notice.  834 F. Supp. 2d at 870.  On the other hand, that Airport handled about 40,000 departing and arriving passengers per month, *id*. at 868, whereas the Denver Airport handles far more than that per day.

The Court's own research has revealed that airports ahead of the Denver Airport in 2016 passenger statistics have varied requirements:

- •     O'Hare International Airport (Chicago) — six business days, *see* Chicago Department of Aviation Amended Rules and Regulations Governing First

Amendment Activities at the City of Chicago Airports § 3(A) (Sept. 18, 2015), *available at* http://www.flychicago.com/SiteCollectionDocuments/ OHare/AboutUs/cdaamendedRulesandRegs.pdf (last accessed Feb. 16, 2017);

- Dallas-Fort Worth International Airport — three business days, *see* Code of Rules and Regulations of the Dallas-Fort Worth International Airport Board, ch. 3, § 4, art. VI(A) (2006), *available at* https:// www.dfwairport.com/cs/groups/public/documents/webasset/p1_008800 .pdf (last accessed Feb. 16, 2017);

- John F. Kennedy International Airport (New York City) — twenty-four hours, *see* Port Authority of New York and New Jersey Airport Rules and Regulations § XV(B)(2)(a) (Aug. 4, 2009), available at http:// www.panynj.gov/airports/pdf/Rules_Regs_Revision_8_04_09.pdf (last accessed Feb. 16, 2017).

Obviously there is no clear trend. Depending on how these airports define "business day," some of these time periods may actually be longer than the Denver Airport's seven-day requirement.

In any event, Plaintiffs have never explained how the Airport, in its particular circumstances, cannot reasonably request seven days' advance notice as a general rule. Indeed, Plaintiffs could not cite to this Court any case holding that any advance notice requirement applicable to a nonpublic forum was unconstitutional in all circumstances. Accordingly, Plaintiffs have not made a strong showing of likelihood of success on this particular theory of relief.

30

c.   *Reasonableness of the Regulation 50.03's Lack of a Formal Process for Handling Permit Application More Quickly in Exigent Circumstances*

Plaintiffs would prefer that they be allowed to demonstrate at the Airport without any advance notice in "exigent circumstances."  Given the serious and substantial purposes served by an advance notice requirement, the Court cannot say that Plaintiffs are likely to succeed on this score.  Plaintiffs have given the Court no reason to hold that the Airport has a constitutional duty, even in exigent circumstances, to accommodate demonstrators as they show up, without any advance warning whatsoever.

Nonetheless, the Airport's complete lack of any formal mechanism for at least *expediting* the permit application process in unusual circumstances raises a substantial and serious question for this Court.  As noted in Part IV.A, above, timing and location are cardinal First Amendment considerations, and a number of cases regarding *public* fora (streets and parks) have held or strongly suggested that an advance notice requirement is unconstitutional if it does not account for the possibility of spontaneous or short-notice demonstrations regarding suddenly relevant issues.

Indeed, as the undersigned pointed out to Defendants' counsel at the Preliminary Injunction Hearing, Denver itself is willing to accept an application for a street parade on twenty-four hours' notice (as opposed to its standard requirement of thirty days) "if the proposed parade is for the purpose of spontaneous communication of topical ideas that could not have been foreseen in advance of [the] required application period or when circumstances beyond the control of the applicant prevented timely filing of the application."  Denver Mun. Code § 54-361(d).  But again, this governs a public

31

forum (city streets), where time, place, and manner restrictions such as this must satisfy a narrow tailoring analysis and leave open ample alternative channels for communication.  *See Perry*, 460 U.S. at 45.  As the above discussion makes clear, under controlling authority the Airport need not satisfy the same legal standards.

The parties have not cited, nor has the Court located, any case specifically discussing the need for a *nonpublic* forum to accommodate short-notice demonstrations.  But the Court likewise has not found any case expressly precluding that consideration when evaluating reasonableness in the context of a nonpublic forum. It is perhaps unsurprising that the specific question has never come up in a nonpublic forum until now.  The Court believes it to be an accurate observation that this country has never before experienced a situation in which (a) the motivation to protest developed so rapidly *and* (b) the most obviously relevant protest locations was a place the Supreme Court had already declared to be a nonpublic forum—the airport terminal.

When evaluating the reasonableness of a First Amendment restriction in a nonpublic forum, the Court concludes that it may appropriately consider the ability to shorten an advance notice requirement in a place like the Airport, given how unique airports are within the category of nonpublic fora.  As Justice O'Connor noted in *Lee*, most of the Supreme Court's major nonpublic forum cases *aside from* airport cases have involved

> discrete, single-purpose facilities.  *See, e.g.*, [*United States v.*] *Kokinda*, [497 U.S. 720 (1990)] (dedicated sidewalk between parking lot and post office); *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788 (1985) (literature for charity drive); *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) (utility poles);

> *Perry*, *supra* (interschool mail system); *Postal Service v.*
> *Council of Greenburgh Civic Assns.*, [453 U.S. 114 (1981)]
> (household mail boxes); *Adderley v. Florida*, 385 U.S. 39
> (1966) (curtilage of jailhouse).

505 U.S. at 688 (parallel citations omitted). As Justice O'Connor observed, however, many airports have become large, multipurpose facilities, *see id*. at 688–89, and that describes the Denver Airport well. To be sure, the reason for expanding beyond the bare minimum of infrastructure needed to handle travelers and airplanes is to promote air travel—to make the airport a more convenient and welcoming location specifically (although not exclusively) for travelers—but the reasonableness of First Amendment restrictions must nonetheless be judged according to the "multipurpose environment that [airport authorities] ha[ve] deliberately created." *Id*. at 689.

Moreover, modern airports are almost always owned and operated by a political body, as well as secured by government employees. Thus, short-notice demonstrations reasonably relevant to an airport are also reasonably likely to be demonstrations about political or otherwise governmental topics, "an area in which the importance of First Amendment protections is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (internal quotation marks omitted).

Given all this, and in light of the First Amendment interests in location and timing that this very case has made salient, the Court finds it unreasonable for the Airport to have no formal process by which demonstrators can obtain an expedited permit when— to borrow from the Denver parade ordinance—they seek to communicate topical ideas reasonably relevant to the Airport, the immediate importance of which could not have been foreseen in advance of the usual seven-day period, or when circumstances

beyond the control of the applicant prevented timely filing of the application.  The Court

further finds in the particular circumstances of the Airport that reasonableness requires

a process by which an applicant who faces such circumstances can request a permit on

twenty-four hours' notice.  If this is all the notice Denver needs to prepare for a street

parade, the Court can see no reason why more notice is needed (in exigent

circumstances) for a substantially more confined environment like the Airport.[5]

Accordingly, the Court finds that Plaintiffs are strongly likely to succeed in their

challenge to Regulation 50.03 to this limited extent.

> d.  *Reasonableness of the Airport's Power to Control the Location of Permitted Expressive Activity*

At the Preliminary Injunction Hearing, it became clear that Plaintiffs not only wish

for a more expansive right to protest in the Jeppesen Terminal, but they also argue for

the right to select precisely where in the Terminal they should be allowed to stand.  The

Court recognizes that, from Plaintiffs' perspective, their message is diluted if they

cannot demonstrate in the international arrivals area, and this is a legitimate concern for

all the reasons discussed previously about the power of location when conveying a

message.  The Court must also account, however, for Airport administrators' superior

knowledge about airport operations, foot traffic patterns, concerns particular to the

---

[5] At the Preliminary Injunction Hearing, Defendants' counsel argued that preparing for a street parade is actually easier than preparing for demonstrations at the airport.  The Court cannot fathom how this could possibly be the case, at least when comparing a typical street parade request to the typical Airport demonstration request.  Indeed, the normal street parade request window is thirty days, suggesting just the opposite.  Denver Mun. Code § 54-361(d). The challenges may be different, but the Court cannot accept—on this record, at least—that Airport demonstrations on average require more preparation time than do public parades or marches.

specific day of the protest, and so forth.

Regulation 50.04-1 requires permit applicants to specify "each location at which the [expressive] activity is proposed to be conducted," but nowhere in Regulation 50 is there any limitation on the Airport's discretion whether to approve the location request. Rather, the only provision addressing this topic is Regulation 50.04-6, which applies to a demonstration already underway: "The CEO may move expressive activity from one location to another and/or disperse such activity around the airport upon reasonable notice to each affected person when in the judgment of the CEO such action is necessary for the efficient and effective operation of the transportation function of the airport."

There is no evidence that Airport administrators are using their discretion when approving a demonstration's location to suppress or dilute a particular message, but there is also no logical reason to leave Airport administrators' discretion essentially unfettered at the permitting stage while restricting it once the demonstration is underway.  The Court finds Plaintiffs are likely to succeed at least in proving that Regulation 50.04-1 is unreasonable to the extent the Airport's discretion is not restrained to the same degree as in Regulation 50.04-6.  Defendants will therefore be enjoined to follow the same restraints in both settings.

       e.     *Reasonableness of Regulation 50.09's Prohibition of Signage Within the Jeppesen Terminal, and Regulation 50.08-12's Limitation of All Signs to One Square Foot*

Regulation 50.09 establishes that "picketing" (defined to include "displaying one or more signs, posters or similar devices," Regulation 50.02-8) is totally prohibited in the Jeppesen Terminal unless as part of a labor protest.  And, under Regulation 50.08-12,

35

any permissible sign may be no larger than "one foot by one foot in size."

Any argument that the picketing ban is reasonable in the context of the Airport is foreclosed by Justice O'Connor's analysis of the leafleting band at issue in *Lee*. *See* 505 U.S. at 690–93. Leafleting usually involves an individual moving around, at least within a small area, and actively offering literature to passersby. Signholding is usually less obtrusive, given that the signholder often stays within an even smaller area and conveys his or her message passively to those who walk by and notice the sign. The Court simply cannot discern what legitimate or reasonable Airport purpose is served by a complete ban on "picketing" or signholding among permitted demonstrators in the Jeppesen Terminal.

The Court also finds the one-foot-by-one-foot signage restriction unreasonable. The Airport has a legitimate interest in regulating the size of signs, as well as other aspects of their display (such as whether they will be held in the air, as in traditional picketing), but a one-foot-by-one-foot restriction is barely distinguishable, both legally and as a factual matter, from a complete ban. The point of a sign is to make a message readable from a distance. Few messages of substance are readable from any kind of distance if they must be condensed into one foot square. Reasonableness instead requires the Airport to consider the size of the signs that a permit applicant wishes to display as compared to the needs and limitations of the location where the applicant will demonstrate. Any restriction by the Airport which limits the size of a permit applicant's signage beyond that which may be reasonably required to prevent the restriction or impeding of the normal flow of travelers and visitors in and out of Jeppesen Terminal will be preliminarily enjoined.

36

f.    *Viewpoint Neutrality*

A nonpublic forum is not required to be content-neutral, but it is required to be

viewpoint-neutral with respect to the First Amendment activity it permits.  *Hawkins*, 170

F.3d at 1288.  Regulation 50, on its face, is viewpoint neutral, and Plaintiffs do not

argue otherwise.  Rather, they say that "Regulation 50 is being *enforced* as a clearly

view-point-based restriction."  (ECF No. 2 at 14 (emphasis added).)  This appears to be

an as-applied challenge:

> Individuals walk through Denver International Airport with
> political messages and slogans on their shirts and luggage
> and discuss politics on a daily basis.  Counsel for Plaintiffs
> has worn political shirts while traveling through Denver
> International Airport and discussed modern politics with
> fellow passengers on many occasions.  However, no other
> individual, to Plaintiffs or Plaintiffs' counsel's knowledge, has
> been threatened with arrest for engaging in this political
> speech.  Nor has any individual been arrested for displaying
> pro-President Trump messages, for example a red hat that
> reads "Make America Great Again."  Only Plaintiffs'
> expressive activity against the President's Executive Order,
> and others advocating similarly, has been threatened with
> arrest.

(*Id*.)  Denver responds:

> The permit requirement furthers the nonpublic forum
> purpose by mitigating disruption at the airport by individuals
> who choose to be at the airport *for non-travel related
> activities*.  In *Stanton*, the [Northern District of Indiana]
> rejected this exact argument challenging a nearly identical
> permitting rule of the Fort Wayne-Allen County Airport on an
> as applied basis by distinguishing between incidental
> expressive activities by members of the traveling public
> versus those arriving at the airport solely for purposes of
> engaging in expressive speech.  Any messages a traveler or
> individual picking up a family member conveys by wearing
> T-shirts or hats are "incidental to the use of the Airport's
> facilities" by persons whose "primary purpose for being
> present at the Airport is a purpose other than expressing

37

> free speech rights," which is different in kind than individuals
> arriving at an airport whose primary purpose is expressive
> speech. *Id*. at 880–882.

(ECF No. 20 at 11 (emphasis added).)

This argument obviously relies on a particular interpretation of Regulation 50 (given that the Regulation itself makes no explicit distinction between those who arrive at the airport for travel-related purposes and those who do not). Nonetheless, this is how Airport administrators interpret Regulation 50, as they made clear at the Preliminary Injunction Hearing. They also made clear that they have never sought to enforce Regulation 50 against someone wearing a political shirt, for example, while on airport-related business. Plaintiffs' own arguments support the sincerity of the Airport administrators' testimony. By Plaintiffs' own admission, they are unaware of anyone going about his or her typical airport-related business who has been arrested or even threatened with arrest for wearing a political shirt, discussing politics, etc.

At the Preliminary Injunction Hearing, Plaintiffs attempted to present an as-applied viewpoint discrimination case by showing that the Airport regularly allows individuals to hold rallies, display signs, and so forth, for returning servicemembers and veterans, yet without requiring those individuals to obtain a permit under Regulation 50. The Court agrees that pro-military and pro-veteran messages are political statements, at least to the extent being conveyed by someone not at the Airport to welcome home a relative or loved one (and perhaps even by those persons as well). Thus, it would seem that pro-military messages would fall under Regulation 50. However, Plaintiffs have failed at this stage to show that the Airport's alleged treatment of pro-military and pro-veteran messages amounts to viewpoint discrimination.

38

At the outset, Plaintiffs fail to note the subjective element of their claim: "viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose." *Pahls*, 718 F.3d at 1230.  In that light, it is tenuous to suggest that allowing (allegedly) unpermitted pro-military or pro-veteran expression at various times in the past but not allowing these recent unpermitted protests against the Executive Order is evidence of viewpoint discrimination.  The question of whether our nation should honor servicemembers and the question of how our nation should treat foreign nationals affected by the Executive Order are not really in the same universe of discourse.  To bridge the gap, it takes a number of assumptions about where pro-military attitudes tend to fall in the American political spectrum, and what people with those attitudes might also think about the Executive Order.  This would be a fairly tall order of proof even outside the preliminary injunction context.

Moreover, Plaintiffs' evidence of unpermitted pro-military expression is fairly weak.  Plaintiffs' main example is the activities of the Rocky Mountain Honor Flight, an organization that assists World War II veterans to travel to Washington, D.C., and visit the World War II Memorial, and then welcomes them home with a large and boisterous rally held in the meeter-and-greeter portion of the Great Hall.  A former servicemember who helped to organize one of these rallies testified that she inquired of a more-senior organizer whether the Airport required any special procedures, and the answer she received was "no."  However, Airport administrators presented unrebutted testimony that Rocky Mountain Honor Flight rallies are planned far in advance and sponsored by the Airport itself, in connection with TSA and certain airlines.  The Airport does not need

a Regulation 50 permit for its own expressive activities, and a government entity's expression about a topic is not a matter of First Amendment concern.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

Apart from the Rocky Mountain Honor Flight, Plaintiffs' evidence comprises photos they gleaned from a Getty Images database showing individuals over the last decade or so being greeted at the Airport by persons holding signs.  Some of these signs appear to be simple "welcome home" signs directed at specific returning family members.  In the obviously servicemember-related photos, American flags are common.  The Court finds that these photos, presented out of context, are not sufficient evidence to make a strong showing of likelihood of success regarding viewpoint discrimination, particularly the subjective intent requirement.  Thus, the Court finds no reason for an injunction based on alleged viewpoint-discriminatory conduct.[6]

4.    Is Regulation 50 Overbroad or Vague?

Plaintiffs bring both overbreadth and vagueness challenges to Regulation 50, which, in this case, are really two sides of the same coin.  If a speech regulation's sweep is unclear and may potentially apply to protected conduct, a court may invalidate the regulation as vague; whereas if the regulation actually applies to unprotected as well as protected speech, an individual who violates the regulation through unprotected speech may nonetheless challenge the entire statute as overbroad.  *See Grayned v.*

---

[6] Even if Plaintiffs' evidence were enough, the Court would find at this stage of this litigation that the only injunctive relief appropriate in light of the balance-of-harms and public interest considerations, below, would be an injunction to enforce Regulation 50 evenhandedly. Such an outcome would not advance Plaintiffs' interests here.

*City of Rockford*, 408 U.S. 104, 108–09, 114–15 (1972); 1 *Smolla & Nimmer on Freedom of Speech* ch. 6 (Oct. 2016 update).  Here, Plaintiffs argue either that Regulation 50 is overbroad because it forbids (without a permit) protected conduct such as wearing a political hat while walking to one's flight (ECF No. 2 at 16–18); or it is vague because it is unclear to what it applies precisely, given that Plaintiffs have seen Regulation 50 enforced against themselves but not against those who wear political hats or buttons, who are welcoming home military veterans, etc., all of whom are "seemingly in violation" of the Regulation (*id*. at 18–20).

The first task, then, is to determine what Regulation 50 actually encompasses. Again, the Regulation states that "no person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee."

The portion about leafleting, conducting surveys, displaying signs, gathering signatures, or soliciting funds is not vague.  It does not fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Grayned*, 408 U.S. at 108.  Nor is it overbroad given that it is not a complete prohibition of leafleting (as in *Lee*), but simply a prohibition without a permit.

The arguably difficult portion of Regulation 50 is the "or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes" clause.  It is grammatically possible to interpret this passage as extending to any religious, charitable, or political "speech related activity" by anyone at the Airport,

41

including travelers wearing political buttons or sharing their religious beliefs with others.

Denver argues that no person of ordinary intelligence would have such a worry: "a person of ordinary intelligence cannot reasonably claim that they are unable to discern the difference between a traveler walking through the airport with a 'make America great again' baseball cap or travelers discussing politics as they walk to their intended destination and a gathering of people who have no purpose for being at the airport other than to march or station themselves in order to communicate their position on a political issue." (ECF No. 20 at 14.)  This argument is slightly inapposite.  The question is not whether someone can distinguish between a passenger's pro-Trump hat and a gathering of anti-Trump protesters.  The question is whether Regulation 50 contains such a distinction, and particularly a distinction between the incidental activities of those who come to the airport for airport-related purposes and the intentional activities of those who come to the airport to demonstrate.

However, to the extent Denver means to say that Regulation 50 would not be interpreted by a person of ordinary intelligence to encompass, *e.g.*, a traveler choosing to wear a "Make America Great Again" hat, the Court agrees.  Regulation 50 is not, as Plaintiffs suggest, just one paragraph from Regulation 50.03.  Regulation 50 comprises sixteen major subdivisions, many of which are themselves subdivided.  A person of ordinary intelligence who reads Regulation 50—all of it—cannot avoid the overwhelming impression that its purpose is to regulate the expressive conduct of those who come to the Airport specifically to engage in expressive conduct.  Thus, Regulation 50 is not vague.

As for overbreadth, "[t]he first step in [the] analysis is to construct the challenged

42

statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). For the reasons already stated, the Court finds that the only reasonable construction is one that does not extend to an airline passenger wearing a political T-shirt, or anything of that character. *Cf. Jews for Jesus*, 482 U.S. at 575. This is, moreover, the Airport's own interpretation, the sincerity of which is borne out by Plaintiffs' own experience. Thus, Regulation 50 is not overbroad.[7]

## C.   Irreparable Harm

Having found that Plaintiffs are strongly likely to succeed in invalidating a narrow subset of Regulation 50, the Court returns to irreparable harm. Given that Plaintiffs First Amendment rights are at stake in those portions of Regulation 50 that the Court finds to be unreasonable, irreparable harm almost inevitably follows: "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks omitted).

## D.   Balance of Harms

The injury to a plaintiff deprived of his or her legitimate First Amendment rights almost always outweighs potential harm to the government if the injunction is granted. *See Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)*; ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). Thus, the Court finds that the harm to Plaintiffs from the

---

[7] Even if Regulation 50 were vague or overbroad, the Court would nonetheless find that an injunction against enforcing Regulation 50 as a whole would be against the public interest. The more appropriate remedy would be an injunction to follow precisely the interpretation that the Airport currently follows, but that would be of no benefit to Plaintiffs.

Airport's continued enforcement of the unreasonable portions of Regulation 50 would be greater than the harm to the Airport in refraining from such enforcement, particularly given that the unreasonable portions are quite limited and most of Regulation 50 will remain unchanged.

### E.    Public Interest

Finally, as with irreparable injury and balancing of interests, it is almost always in the public interest to prevent a First Amendment violation.  *See Awad*, 670 F.3d at 1132; *Johnson*, 194 F.3d at 1163.  Moreover, the Court is not striking down Regulation 50 or even altering it in any significant respect.  Thus, the public's interest in safe and efficient Airport operations remains unaffected.

### F.    Bond

A party awarded a preliminary injunction normally must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Tenth Circuit has held, however, that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm."  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (internal quotation marks omitted); *see also* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954 n.29 (3d ed., Apr. 2016 update) (citing public rights cases where the bond was excused or significantly reduced).  Denver has not argued that Plaintiffs should be required to post a bond, and the Court finds that waiver of the bond is appropriate in any event.

Case 1:17-cv-00332-WJM-MJW   Document 29   Filed 02/22/17   USDC Colorado   Page 45 of 46

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Plaintiffs' Motion for Preliminary Injunction (ECF No. 2) is GRANTED to the

limited extent stated in this order and otherwise DENIED;

2.    The City and County of Denver (including its respective officers, agents,

servants, employees, attorneys, and other persons who are in active concert or

participation with any of them, and further including without limitation Defendants

Lopez and Quiñones) (collectively, "Defendants") are PRELIMINARILY

ENJOINED as follows:

a.    Defendants must timely process a permit application under Denver Airport

Regulation 50.04-1 that is received less than 7 days but at least 24 hours

prior to the commencement of the activity for which the permit is sought,

provided that the applicant, in good faith, seeks a permit for the purpose

of communicating topical ideas reasonably relevant to the purposes and

mission of the Airport, the immediate importance of which could not have

been foreseen 7 days or more in advance of the commencement of the

activity for which the permit is sought, or when circumstances beyond the

control of the applicant prevented timely filing of the application; however,

circumstances beyond Defendants' control may excuse strict compliance

with this requirement to the extent those circumstances demonstrably

interfere with the expedited permitting process;

b.    So long as a permit applicant seeks to demonstrate in a location where

the unticketed public is normally allowed to be, Defendants must make all

45

reasonable efforts to accommodate the applicant's preferred location, whether inside or outside of the Jeppesen Terminal;

c. Defendants may not enforce Denver Airport Regulation 50.09's prohibition against "picketing" (as that term is defined in Regulation 50.02-8) within the Jeppesen Terminal; and

d. Defendants may not restrict the size of a permit applicant's proposed signage beyond that which may be reasonably required to prevent the impeding of the normal flow of travelers and visitors in and out of Jeppesen Terminal; and specifically, Defendants may not enforce Denver Airport Regulation 50.08-12's requirement that signs or placards be no larger than one foot by one foot.

3. This Preliminary Injunction is effective immediately upon issuance of this Order, and will remain in force for the duration of this action unless otherwise modified by Order of this Court.

Dated this 22nd day of February, 2017, at 8:05 a.m. Mountain Standard Time.

BY THE COURT:

William J. Martínez
United States District Judge